# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. Action No. 06-0064 (JR)** |
| | ) | |
| **CHARLES EMOR,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR NEW TRIAL

Charles Emor, through undersigned counsel, respectfully requests that this Court grant him a new trial based on what has only recently been revealed to the defense as blatant violations by the government of its clear obligations under *Brady,*[1] *Jencks*[2] and Rule 16.   As we demonstrate below, these violations substantially impaired Mr. Emor's ability to adequately prepare and present his defense at trial, to cross-examine adverse witnesses effectively and fully, to review Rule 16discovery, and to conduct a thorough and complete investigation of the case prior to trial.  For the reasons that follow, we submit that the government's violations in this case deprived Mr. Emor of his right to a fair trial and, for that reason, the Court must grant him a new trial.

---

[1]     *Brady v. Maryland,* 373 U.S. 83 (1963)

[2]     18 U.S.C. § 3500.

## I. <u>INTRODUCTION</u>

On December 21, 2006, after a three-day jury trial, Charles Emor was convicted of a single count of conspiracy to commit mail fraud. As we demonstrate below, the evidence adduced at trial against Mr. Emor was weak at best in two critical respects.

First, there was no evidence to support a conclusion that Mr. Emor knew that he had purchased stolen computers from anyone involved in alleged conspiracy. Second, - there was no evidence corroborating the government's theory of the case – introduced for the first time at trial - that there were two phases of the alleged conspiracy. In essence, the government secured a conviction against Mr. Emor based almost exclusively on the uncorroborated testimony of two government cooperating witnesses, Mike Ralph and Orlando Marshall. A third cooperating witness and alleged co-conspirator, Dwayne Simmons, also testified at trial, but had no relevant interaction with Mr. Emor. Mr. Simmons testified that he could not say that Mr. Emor knew that the computers he had purchased were stolen. Tr. 340.

In order to adequately defend Mr. Emor at trial, it was crucial that Mr. Emor's defense counsel to be able use all relevant and available information to impeach the credibility of the two cooperating government witnesses, Mr. Ralph and Mr. Marshall, both of whom repeatedly admitted to lying to investigators and prosecutors. In order to obtain from the government any materials that would be important in impeaching the credibility of these two witnesses, Mr. Emor's previous counsel sent several letters specifically requesting the disclosure of any *Brady* information and *Giglio* material. Copies of those letters are attached hereto as Exhibits A and B. Even prior to the trial, the government failed to provide information mandated by *Brady* and *Giglio*, compelling Mr. Emor's counsel to file a formal motion with the Court seeking disclosure of *Brady* and *Giglio* material on September 28, 2006. *See* Dkt. Entry No. 25.

In its opposition to Mr. Emor's motion, the government, in a cursory and dismissive fashion, merely stated "the government understands its ongoing obligations with respect to *Brady* and *Giglio* material and will supplement the discovery already provided if necessary." *See* Opposition filed on October 19, 2006 (Dkt. Entry No. 26), at page 1, paragraph 1.  No *Brady* material was provided or supplemented.

Only recently, **and after the completion of the trial in this case**, new counsel for Mr. Emor received a letter from Mr. Austin (which is incorrectly dated January 3, 2006, although the letter was actually received on January 3, 2007), in which Mr. Austin acknowledged that significant Jencks material related to Orlando, Marshall, a key government witness, had not been turned over either before or during the trial as was required by federal statute.   The letter, as copy of which is attached hereto as Exhibit C, reads, in part:

> As I mentioned to you yesterday, enclosed is an audiotape and videotape of an MPD interview of Orlando Marshall from July 12, 2002 that should have been turned over during the trial as *Jencks*.[3]  Prior to the trial, I separated the audiotape and videotape from the other trial materials in order to get them copied but inadvertently failed to get them copied and did not listen to them myself until December 28, 2006. . . .

> Out of an abundance of caution, I am also providing you with internal corporate investigative reports of John Karr which contain his summary of Marshall's taped statement.

As we will demonstrate below, the government's failure to discharge its unequivocal legal obligation to disclose such vital information to the defense resulted in extreme prejudice to Mr. Emor and deprived him of his ability to adequately and fairly defend himself at trial.  In his letter, the prosecutor fails to mention that the reports of John Karr, a trial witness, were not provided as Jencks for either him or Orlando Marshall.  We submit that had the government

---

3       It also should have been turned over *prior* to trial pursuant to *Brady*.

properly disclosed this information, it is very likely that the outcome of the case, a case that even this Court acknowledged was a close one, would have been different.    As a result, Mr. Emor's conviction cannot stand and this  Court must grant a motion for a new trial.

## II.    FACTUAL BACKGROUND

As both sides acknowledged at trial, the principal issue in this case was whether Mr. Emor knew that the Gateway computers he received from Michael Ralph – to whom he had met through  Orlando Marshall – were stolen.  Two weeks *after* the trial had concluded the government – ***for the first time*** – provided the Defendant with the first video-taped and audio-taped interview that Orlando Marshall gave to the police.  A transcription of Mr. Marshall's July 12, 2002 statement is attached hereto as Exhibit D, and a copy of the videotape has been filed as Exhibit E.  In making this disclosure, the government claims that Mr. Marshall's videotaped statement constituted Jencks that should have been turned over at trial, but which government counsel "inadvertently" misplaced.  Even the government concedes that its failure to turn over the videotaped statement was a clear violation of its legal obligations under the Jencks Act. Upon reviewing Mr. Marshall's videotaped statement, however, it is clear that this earlier statement was completely inconsistent in material respects from his testimony at trial and, as such, the videotaped statement also constitutes a clear violation of the government's obligations under *Brady*.  Simply stated, this statement should have been disclosed to the defense long before trial as *Brady* information the defense could have used both in attacking the government's evidence at trial as well as proactively investigating other aspects of the case.

Mr. Marshall's videotaped statement constitutes *Brady* material with respect to  three critical issues:

(1)    First, contrary to his  trial testimony, in the videotaped statement, Mr. Marshall states that it was his understanding that Mr. Emor  was simply buying the Gateway computers at a discount, namely, at wholesale, thus completely undermining Mr. Marshall's trial testimony that Mr. Emor knew the computers were stolen;

(2)    Second, in his videotaped statement, Mr. Marshall describes the post-search-warrant telephone conversation he had with Mr. Emor just hours – if not minutes – before giving this statement, and his description of what Mr. Emor said in that conversation is  completely innocent and completely contrary to Mr. Marshall's trial testimony concerning the same phone call; and

(3)    Third, in his trial testimony, Mr. Marshall described in great detail how he had interacted with Mr. Emor during the conspiracy (*see, e.g.,* Tr. at 223), but in his videotaped statement, Mr. Marshall  completely contradicts this testimony and instead, tells investigators that he put his cousin Mike Ralph "in touch with Charles Emor . . . [a]nd they made those purchases on their own.  *I had no involvement [in that aspect of the conspiracy].*"

In addition, contrary to what the government claims now, the defense was not provided with other material regarding Mr. Marshall that would have essentially "substituted" for the videotaped statement the government failed to disclose.  There is a plethora of information in Mr. Marshall's videotaped statement that Mr. Emor's defense counsel could have and would have used as the basis of other devastating impeachment of Mr. Marshall.   The government's failure to disclose the videotaped statement deprived Mr. Emor of that opportunity and thus deprived him of a fair trial.  For instance, in the videotaped statement, *Mr. Marshall made the following statements:*

Q2: Most of the proceeds from that operation, were they going towards Mike's new business, business venture he was starting up?

OM: Um I don't know, I don't know how much Mike and Dwayne, I don't know what the percentage rate or how much money he kept, or how much money Dwayne kept. I never got into that. Me and him had a falling out about, um, about money. Like I said, every now and then when they felt the need to give me you know 50 dollars, a 100 dollars here, they would give it to me but you know, I knew I was giving them a lot of money and I didn't really get anything from him. And after a while like I said, I started off to help him out and then I was like, I got to the point where like "hey man I helped you out, you know, now what are you gonna do for me?" And I never got anything.

Q: Over the course of this whole operation, as you were involved in it, would you be able to tell me, or estimate, how much money you received as a result?

OM: I would say, probably, I can say maybe 40,000 dollars.

Q2: You received 40,000 dollars?

OM: Approximately. Oh, for myself?

Q2: Yea

OM: Oh no, no. For myself I got maybe $1000 of that

Q: So does it surprise you that we we've been able to track, just roughly just alone to your name and the variations of it, 120 pieces. Would that surprise you?

OM: Could you repeat that question?

Q: in deliveries

OM: Mhm

Q: to your G Street address

OM: Yes

Q: Would it surprise you if I said that you received probably about 122 pieces?

OM: I didn't think it was that many. I mean I never kept a count but, you know, they were coming pretty regularly. Um, you know, sometimes four in one week. Not at the same time but they were coming pretty steadily.

Q: And part of those would be either computers or systems that you sold or deliveries you accepted on behalf of Mr. Jalloh?

OM: Primarily, the computers that were sent to my home were for Mr. Jalloh, for him to pick up. Like I said, he had a person who he was dealing with. Don't know who that person was but that person was in turn purchasing the computers from him.

Q: How long would the deliveries take?

OM: Um they were, they were gone quick. I mean, it would pretty much if they got there by around 5 or 6, they were gone the same day.

Q2: What was the time frame of your dealings between Mike and the Gateway computers coming in and out of your apartment? Did that last for a 2 year period, a year period or . . . ?

OM: Going on about a year now

Q: Do you know the time frame as far as dates?

OM: I don't, let me see. Um it probably started, probably, let me think. Um probably around I would say before November, before October.

Q: Of what year?

OM: Of 2001.

Q: And it ended about?

OM: It ended about, let me see, it ended in roughly May of 2002.

Ex. D at 17-18.

Based on this excerpt alone, had the government disclosed Mr. Marshall's videotaped statement, defense counsel would impeached Mr. Marshall with respect to the amount of money he personally profited, whether it was $1,000 or $40,000; whether his time estimates and testimony with respect to Mr. Emor's receipt of computers was truthful given that he could not recall receiving 120 boxes in a six month period of time preceding his interview by police and thought the number seemed too high; that the bulk of the computers were sent to Mr. Marshall's home were for Mr. Jalloh, and *not Mr. Emor*; and that the entire conspiracy lasted between October of 2001 and May of 2002. Furthermore, the impeachment would have been far more devastating and effective by showing Mr. Marshall's prior inconsistent statements on a videotape as opposed to coming from a document.

In addition, Mr. Marshall would have been extensively cross-examined whether Mr. Jalloh, his friend, was the recipient of the majority of the computers in the scheme, not Mr. Emor. As noted above, Mr. Marshall told law enforcement just moments before in the interview that he did not have any direct involvement with Emor's transactions. On page 19 of the transcript, Mr. Marshall stated:

> Well, Mike told me back in, let me see. I wanna say maybe early May of 2002, that Gateway was doing an inventory. And um, he said to me that he wouldn't be able to probably send any more computers. And I said, "well that's fine." And he told me that there was a possibility that they could only get CPUs. Um Abdul, I told Abdul. I passed this information on to Abdul. And he told me well, you know, his boys wanted CPUs, and Mike checked. They waited and things were, and he said he was gonna wait for it to stop getting hot. He then proceeded to start up. Sent a shipment of CPUs. And he only sent a few of them. Then it stopped.

Q: You also indicated in our conversation before that Abdullah, or Abdul Jalloh had been sending the computers elsewhere.

OM: Yes

Q: From some of the stuff he was getting, where was he sending it to?

OM: I believe he was sending them to um somewhere in Africa. He's not Nigerian, I can't recall what country's he's from. I think it's Liberia. But he mentioned to me that it was very expensive to send stuff back to Africa.

In addition, counsel should have been able to explore whether starting and stopping of shipments to Mr. Jalloh was the Phase I and Phase II that Mr. Marshall referred to in his trial testimony and the government disclosed for the first time at trial.  This discrepancy is *Brady*.

Also, counsel for Mr. Emor would have been able to cross-examine Mr. Marshall that it was Mr. Jalloh who Marshall warned that things were "getting hot," and not Mr. Emor.  This would call into dispute Mr. Marshall's and Mr. Ralph's statements that Mr. Emor received the bulk of the computers.  Finally, Mr. Emor would have been able to attempt to track international shipping records from Mr. Jallah had he known that Jalloh had sent a large volume of computers overseas.

On all of these critical points, Marshall's taped statement is the *only* source with which he could have been impeached.  It is the sole source of the *Brady* material it contains.  Its format – a videotape – makes it all the more powerful because, unlike a cold transcript, the jury could have seen and heard Marshall on that tape, thereby enhancing the credibility of what he says there.  The jury should have been able to see and hear Mr. Marshall indicate that he had no involvement in the deals with Mr. Emor.  If the jury would have credited this exculpatory information, it

would have eviscerated Mr. Marshall's trial testimony that Mr. Emor received the bulk of the computers in this scheme.

In addition, there is a fifth issue for which this tape serves as *another* source of impeachment:  whether the alleged conspiracy began in 1998 or in 2000.  Unlike the other issues, at least the defense had other means of impeaching Marshall on that question.  But this tape would have given Defendant one more evidentiary source to show that Marshall lied in his trial testimony concerning the year of the inception of this conspiracy that he and Messrs. Michael Ralph and Dwayne Simmons conceived and carried out; and in his attempt to implicate Defendant in that conspiracy, *i.e.,* to serve up an additional "head on a platter" in order to enhance his chances of getting a § 5(k)(1) from the government at Marshall's own sentencing.

In this trial, in which the government candidly admitted to the Court that its case had been "eviscerated," there is no question that the outcome would have been different had this tape been provided to the Defendant as *Brady* and *Jencks* material.  Therefore, Defendant is entitled to a new trial.

As noted above, the one thing on which both parties agreed was that the only issue at trial was whether Defendant knew the computers were stolen.  Indeed, the government's initial closing argument began this way:

> Ladies and gentlemen, let's now just cut to the chase.  The single question before you is, did this man know that all those computers he was getting were stolen.  That's it.  That's what these last 3 days has been about.  That is in essence the only question before you.

Tr. at 561.

Defendant agreed that that was the issue.  In his closing, defense counsel argued, "Now, ladies and gentlemen, when you go back you have to decide one critical thing.  Has the

government met its burden in proving to you beyond a reasonable doubt that Charles Emor knew that these computers were stolen?"  *Id.* at 575.

The core of Defendant's defense was that he was told, and believed, that he was getting these computers at a discount as a result of a Gateway employee – Michael Ralph – who, in turn, was getting them through his employee discount.  The person who told Defendant this was Orlando Marshall, whose videotaped statement is the basis of this Motion.  Thus, defense counsel argued in closing, "Well, who is the source?  Orlando Marshall, a social worker. . . . [Defendant] thinks he can trust Orlando.  And Orlando Marshall tells him, ['H]ey, I can introduce you to somebody who can help you get a discount.'  The only person who did not know that that person [Michael Ralph] was a thief was Charles Emor."  *Id.* at 579.

There was, however, little evidentiary foundation for the "discount argument," *i.e.*, the proposition that Marshall had told Defendant that Michael Ralph could get the Gateways at discount because Ralph worked for Gateway.  Marshall certainly never admitted at trial that he had told the Defendant about any discount, or that Marshall had any reason to think that that was Defendant's understanding.  For example, whereas, on cross-examination by Defendant, Marshall admitted that he had never told Defendant that the computers were stolen, he added, "I didn't have to tell him [they were stolen]."  *Id.* at 259.  On re-direct, the prosecutor followed up by asking Marshall, "Why didn't you have to tell [Defendant] that the computers were stolen?"  Marshall responded, "Because he knew."  *Id.* at 269.  The prosecutor then asked, "Did you ever tell [Defendant] that the computers were legitimate?"  Marshall answered, "No, I didn't."

Contrary to his trial testimony, however, Marshall – on the very day the search warrant was executed on his house in July 2002 – told the police that it was his understanding that Defendant was buying these computers at "wholesale."  That interview, which was both video-

and audio-taped, was given by Marshall on July 12, 2002, after an unrecorded debriefing by

MPD Det. Vincent Tucci earlier that same day.  In the course of that interview, the following

colloquy took place:

> Q:    And Mr. Emor, you had indicated at some point that
>        Mr. Emor may have purchased some of the
>        computers through your cousin[, Michael Ralph,]
>        and Mr. Simmons, is that correct?
>
> A:    Yes.
>
> Q:    And what was the purpose for him purchasing these
>        computers, did he ever tell you?
>
> A:    Um, to my knowledge, he was reselling computers.
>        *He was pretty much buying them at wholesale rate*
>        *from them and reselling them.*

Exhibit D at 9 (emphasis added).

That statement is entirely consistent with the core of the defense here, *i.e.,* that Defendant

had no knowledge the Gateway computers were stolen and thought that he was simply the

beneficiary of Michael Ralph's Gateway employee discount.  Had the defense known about this

statement, it could have used it to support the defense's core theory of the case.  Its import is

critical:  it is the only source, coming directly from Orlando Marshall, in which he admits that

Defendant was simply buying these computers at a discounted, wholesale price.  Its impact

would have been powerful, given that the jury could both see and hear Marshall on that

videotape.

That problem, as noted above, is that this recorded statement was never turned over to the

defense until *after trial*.  It contains additional *Brady* evidence, contained nowhere else, that goes

to the core issue of whether Defendant was buying these computers at discount, with no

knowledge that they were stolen.  This concerns the telephone conversation that Marshall had

with the Defendant right after the search warrant was executed, *i.e.,* within hours, if not minutes, before the taping of his July 12, 2002 interview. What Marshall says on that tape is completely different from what his trial testimony was about that telephone conversation.

At trial, Marshall testified that Defendant called him on the day the search warrant was executed but before Marshall went in to the police station for his taped interview.[4] At trial, Marshall tried to spin this conversation as one in which Defendant told Marshall that he (Defendant) was going to lie to the police by telling them that he bought the computers legitimately. For example, on direct, Marshall described their conversation as follows:

> It started off by me telling [Defendant] about the search warrant, all the various law enforcement people who came to my home. I told him that they had asked about him. He sounded very humble in the beginning and he was listening to me, what I had to say. He asked me for what did I think he needed to do. I didn't offer him any advice.
>
> But then the tone of the conversation changed. . . . He became very angry and he said, "[W]ell, listen, this is what I'm going to tell them if they come for me." And he told me that he was going to say he bought all of these computers legitimately, he wrote checks to my cousin for them, and . . . That was pretty much it. It was a short conversation. You know, we said good-bye and that was it.

Tr. at 244-45.

Marshall's attempt to make this look like some lie that Defendant was concocting became even clearer during Defendant's cross of Marshall:

> Q:    . . . The first time you confronted [Defendant] with the fact that they raided you and those computers were stolen, he said, ["H]ey, I bought these computers legitimately.["]  Correct?

---

[4]    Marshall testified that after executing the search warrant, the police let him go to work for a little while before he was scheduled to go to the police station for his taped interview. During that interlude, Marshall called his cousin, Michael Ralph, and told him about the search warrant. Marshall said that Ralph asked him whether Ralph could give Marshall's cell phone number to the Defendant, and that Marshall consented thereto. Shortly thereafter, and before Marshall went to the police station for his taped interview, Marshall says he got a call from Defendant.

  A: No, he told me that's what he was going to say.

  Q: Okay.  He didn't say anything else, did he?  He didn't tell you, ["H]ey, guys, I knew they were stolen.["] He didn't say that, did he?

  A: No, he didn't.

  Q: He told you, ["]I purchased them legitimately,["] didn't he?

  A: He told me that's what he was going to say.

*Id.* at 264.

  During his July 12, 2002 taped interview, however, Marshall recounts a very different conversation with Defendant, one that contained no reference to Defendant's intent to lie to the police about having purchased the computers legitimately.  In that interview, given, at most, within a couple hours of having engaged in that telephone conversation with the Defendant, Marshall tells the police:

> Yes um, he [Michael Ralph] in turn contacted Charles Emor, and he told me that Emor wanted to talk to me. Um, and was it ok for him to give him my cell phone number. I said it's ok. He [Defendant] called me and I told him the same thing I told Mike, that a search warrant was served on me and that they were looking for Gateway computers.
>
> Q: What else did Mr. Emor tell you during this conversation?
>
> A: Um, he told me he didn't have any merchandise, you know, and that if they wanted to come and search they could come.

Ex. D at 8-9.

  If the government had turned over this taped interview before or during trial, the defense would have had additional powerful evidence with which to impeach Marshall's testimony about the content of his post-search-warrant telephone conversation with the Defendant.  That

impeachment would have directly undercut Marshall's testimony that Defendant was planning to lie to the police by saying that he'd bought the computers legitimately.  Such impeachment would have totally blunted Marshall's testimony that the Defendant, in effect, confessed to Marshall that he knew the computers were stolen and *that*, everyone agreed, was *the only issue in this trial.*

As noted above, Marshall's July 12, 2002 taped interview is the only source for the *Brady* material it contains on those two issues.  None of Marshall's other *Jencks* materials contained the statements on these issues.  Remarkably, in the letter by which the government transmits the videotape (Ex. C), the government contends that the content of this taped interview of Orlando Marshall is consistent with other *Jencks* materials that were turned over during trial with regard to Mr. Marshall.  As pointed out in this brief, that is simply not the case.  To take one example:  the July 16 WACIIS report of Det. Vincent Tucci, referred to the in government's letter and attached hereto as Exhibit F, summarized Marshall's interview in eleven bullet points (only one of which refers to Defendant), whereas the videotape transcript runs twenty pages.  Moreover, those eleven bullet points apparently cover a roughly four-hour meeting with Marshall (it says Marshall arrived at the Detective's office at 11:00 a.m., and the videotaping does not conclude until nearly 3:00  p.m.), the twenty-page transcript covers less than a quarter of that time.  Unlike the videotape, the WACIIS report mentions neither Marshall's discussion of how it was his understanding that Defendant was buying the computers wholesale, nor Marshall's telephone conversation with Defendant a short while earlier that day.

Additionally, Mr. Emor was also prejudiced in two separate ways by not having the tape when the government attempted to call Detective Vincent Tucci of the Metropolitan Police Department as a witness at trial.  First, since Detective Tucci, a trial witness, was talking to Mr.

Marshall, the tape constituted *Jencks* with respect to him and was required to be disclosed.

Second, production of the tape would have undermined the purported purpose of Det. Tucci's

testimony, which was to corroborate whether a conversation took place between Orlando

Marshall and Charles Emor.  Had counsel had access to the videotape and audiotape of the

interview, Mr. Marshall could have been impeached through Detective Tucci.  At trial, the

prosecutor tried to characterize the interview by Detective Tucci as a prior consistent statement.

Actually, the videotape illustrates that it was an exculpatory inconsistent statement of Mr.

Marshall under *Brady* and its progeny.

Finally, the tape contains *Brady* with regard to when the alleged conspiracy began.

Contrary to Marshall's trial testimony, in which he said that the conspiracy contained a "Phase I"

which began in 1998, he says on the videotaped statement that it began in 2000.  Thus, the taped

interview would have provided the defense with additional evidence that there was no pre-2000

scheme.  Unlike the evidence discussed above, the defense had other sources with which to

challenge Marshall on that point.  That challenge, however, would obviously have been stronger

had the government provided Marshall's taped statement on a timely basis so that Defendant

could have pointed to yet another instance where Marshall said that the conspiracy did not begin

until 2000.

## III.    LEGAL ANALYSIS

### A.    The Government's Failure to Turn Over Marshall's Taped Statement Constitutes a *Brady* Violation Entitling Defendant to a New Trial.

*Brady* holds that "the suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or punishment,

irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.[5]   There are three components, or elements, of a *Brady* claim:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-282 (1999).

"[I]t is now well settled that the prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case ...." *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) (citation and internal quotation marks omitted).   In addition to exculpatory material, "[t]he government is required to disclose evidence ... that affects the credibility of a government witness where material to guilt or punishment." *Ebron v. United States,* 838 A.2d 1140, 1155 (D.C.2003) (citing *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194;  *Giglio, supra,* note 5, 405 U.S. at 154-55, 92 S.Ct. 763);  *see also Moore v. United States,* 846 A.2d 302, 305 n. 4 (D.C.2004) ("There is, of course, no 'difference between exculpatory and impeachment evidence' when it comes to the prosecutor's duty to disclose evidence favorable to the accused") (citing *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).   Moreover, " 'a prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized,' and the practice of delayed production must be disapproved and discouraged." *Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) (citation omitted).

A recent case from the District of Columbia Court of Appeals is instructive of the problems attendant to the government's failure to turn over *Brady* information in a timely manner.  In *Sykes v. United States*, 897 A.2d 769 (D.C. 2006), the Court of Appeals reversed the

---

[5]      Later cases established the government's obligation to provide *Brady* even when the defense has not requested it.  *United States v. Agurs,* 427 U.S. 97 (1976).  Nonetheless, as noted above, Defendant did request both *Brady* and *Giglio* materials in this case, both in a discovery letter and in a subsequent motion.  *See* Dkt Entry No. 25.

conviction of the defendant in an instance where the prosecutor made a "late disclosure" of *Brady* material, even though, unlike this case, that "late disclosure" was, nonetheless, made before the first witness was called. Similarly to the government's claim in this case, which claims in its letter attached as Exhibit C, that the videotaped statement was consistent with other *Jenck*s and discovery provided, the government argued in *Sykes* that the *Brady* material was "disclosed before opening statements were delivered and, thus, appellant was able to factor this information into his trial strategy." Id. at p. 781. The court soundly rejected the government's argument, ordering a new trial. In so doing, the court held: "The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. This is a fundamental element of due process of law. The government's very tardy disclosure of [two witnesses'] grand jury appearance, approximately one year after that testimony, not only constituted a *Brady* violation, but also deprived the defense, pre-trial, of information that was potentially exculpatory, and favorable at least because of its potential negative impact on the testimony of a key government witness." *Id.* at 780.

So it is here. In this case, in fact, the *Brady* violation is even more egregious because the materials were not turned over until *after* trial. Mr. Emor was, therefore, unable to use the information at trial because the prosecutor neglected to turn the material over to him prior to trial. As the court found in *Sykes,* there is here a reasonable probability that the outcome of trial would have been different and a new trial is required.

There can be no question that the tape of Marshall's July 12, 2002 interview by the police contained evidence that is favorable to the defense. Marshall's statement there concerning his understanding that the Defendant was buying the computers at wholesale is exculpatory: it supports the Defendant's defense that he had no knowledge that he was buying stolen computers

but was, instead, simply the beneficiary of Michael Ralph's Gateway employee discount. Marshall's statement concerning what the Defendant said to him moments earlier when the two men spoke on the telephone is also exculpatory:  Defendant told Marshall he had no merchandise and that the police were free to come and search Defendant's premises.

Moreover, those two statements, as well as Marshall's statement that the conspiracy to sell stolen computers began in 2000, are favorable to the Defendant because they impeach Marshall's trial testimony (as do numerous other aspects of other *Jencks* materials that were not turned over, such as the reports prepared by government witness John Karr).  At trial, Marshall testified that:  1) the Defendant knew the computers were stolen; 2) that he planned to lie to the police by saying that he bought the computers legitimately; and 3) that the conspiracy began in 1998.  All three of those points were impeachable by what Marshall said on the suppressed taped statement.

Thus, the first component, or element, of a *Brady* claim is met here.  The statements made by Marshall during his taped statement are favorable to Defendant, both in the sense that they are exculpatory and that they impeach Marshall's trial testimony on critical points.

The second element – that the evidence was suppressed, either willfully or inadvertently by the government – is also clearly met here.  The tape was not produced by the government until January 3, 2007, *i.e.,* until about two weeks *after* the trial concluded.[6]

---

[6]    Defendant does not question the government's assertion that the failure to produce Marshall's statement was inadvertent.  Nonetheless, the sloppiness reflected by the failure to produce – or even review – Marshall's taped statement is, unfortunately, consistent with other aspects of the government's handling of this prosecution.  For example, the government did not have at least some of the *Jencks* material pertaining to co-conspirator Dwayne Simmons ready to turn over to the Defendant even *after* Simmons had finished testifying.  As a result, the government had to have Simmons stay until the government produced Simmons' *Jencks* to the defense, and the defense had an opportunity to review it.  Indeed, the prosecutor stated in open court that he had not seen this transcript himself prior to trial.  Tr. at 349.  After Defendant had rested his case, the government announced that it had first produced transcripts of conversations from a wire Simmons had been wearing, along with two CDs, the night before.  *Id.* at 559-560.  Finally, the government could not state the evidentiary basis for admitting what it conceded was critical evidence, namely, the charts that had been prepared by government witness John Karr.  *Id.* at

Finally, the third *Brady* element – prejudice – is also met here.  To make out the prejudice element, the suppressed evidence must be material.  "Unless suppressed evidence is material for *Brady* purposes, [its] suppression [does] not give rise to sufficient prejudice to overcome [a] procedural default."  *Banks v. Dretke,* 540 U.S. 668, 698 (2004) (cite and internal quotation marks omitted).   The *Banks* Court went on to note:

> Our touchstone on materiality is *Kyles v. Whitley,* 514 U.S. 419 (1995).  *Kyles* instructed that the materiality standard for *Brady* claims is met when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.  *A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.  In short, [a defendant] must show a reasonable probability of a different result.*

*Id.* at 698-699 (emphasis added; citations and internal quotation marks omitted).

Put another way, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles,* 514 U.S. at 434.

In wrestling with what a "reasonable probability" is in the *Brady* context, this Circuit has stated:

> It is worth pausing here to examine this standard – "reasonable probability" . . .  What is a "reasonable probability"?  Probability is often expressed in terms of percentages, with 100% representing certainty.  We know, because *the Supreme Court has told us, that a "reasonable probability" can be less than 50.01%.*  In other words, *to reverse for a Brady violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed.  See Kyles,* 514 U.S. at 434.  We are also sure that a "reasonable probability" is somewhat greater than 1%.  How much greater?  Enough,

---

427 – 442.  In addition, prior to attempting to move the summary charts into evidence, the Court asked the prosecutor how the summary charts were made.  The prosecutor replied that he did not know how they were made.  *Id.* at 367.

> the Supreme Court says, to "undermine confidence in the verdict," *id.* at 435, which may lead us in a circle: one cannot be confident of the outcome when there is a "reasonable" probability that it may be wrong, and a "reasonable" probability is one high enough to undermine confidence in the outcome.

*United States v. Bowie,* 198 F.3d 905, 908-909 (D.C.Cir. 1999) (emphasis added).[7]

Here, it is clear that had the suppressed evidence been timely produced, there is a reasonable probability of a different result, and that verdict is no longer worthy of confidence. Indeed, even the government candidly admitted the extreme weakness of its case when it tried, unsuccessfully, to admit charts that had been created by government witness John Karr. This admission came midway through the testimony of the government's very last witness (Postal Inspector Marydith Newman), shortly before the government rested. In this context, AUSA Austin conceded:

> Now, the issue is whether or not this evidence (Karr's charts) comes in under the records exception to the hearsay rule. And it absolutely – before I even go there, this is the problem with the decision being made when it was made based on defense counsel not filing a motion on this at a time that would have been appropriate. *It eviscerates the government's opening statement and much of this case,* and it does so because, as you may remember from the government's opening statement, the government indicated that Mr. Emor was using an enormous number of different names, he was sending stuff to an enormous number of different addresses.

Tr. at 428 (emphasis added).

Continuing, the prosecutor admitted:

> As the record stands right now, *the government does not have a single iota of proof that Mr. Emor himself, direct evidence that Mr. Emor himself received even one computer*

---

[7]    At the end of this discussion, the Circuit expressed its relief that it "did not need to face the quandary this poses" because its confidence in Bowie's conviction was unshaken by the government's post-trial revelation in that case. *Id.* at 909.

> at his home or the SunRise Academy.  There is no record of
> that whatsoever.

*Id.* (emphasis added).

Again, these admissions were made shortly before the government rested.  The Court

voiced its agreement with the fact that the government's case was very weak:  "You're virtually

conceding, I think, Mr. Austin, that without those documents, you don't have a case.  I wonder if

the case doesn't just end after the government's case-in-chief with a [R]ule 29 ruling[?]"  Tr. at

439-440.

Those documents were never admitted into evidence.  The Court was unpersuaded by the

government's argument concerning the charts Mr. Karr had prepared, and kept them out.

Nor did that record – from the government's standpoint – ever improve thereafter.  The

evidence that the government sought to elicit through those charts never did come in as

substantive evidence.  Rather, the facts contained in those charts (though not the charts

themselves) were later admitted *for the limited purpose* of showing that the government's

investigation was thorough and conducted in good faith after the Court ruled that defense

counsel had opened the door on those issues.

When the government elicited those facts during its cross-examination of Inspector

Newman, who had been re-called as Defendant's first witness, the Court instructed the jury that

these facts were not admitted as evidence:

> I think it's time for me to explain something to the
> jury here.  The evidence in the case is what the witnesses
> say and what the documents say.  This testimony by an
> investigator in the case indicates what she found or thought
> as a result of her investigation of the case.  It is directly
> responsive to questions by the defense essentially
> questioning the thoroughness of the investigation.

> But what the investigator thought was the case
> before the case was brought *is not evidence in this case, it is
> only to be understood by you as bearing on whether or not
> the investigation was complete*.

*Id.* at 491 (emphasis added).

Thus, what the government admitted was an "eviscerated" case without a "single iota" of evidence shortly before it rested was no stronger by the end of the trial. Defendant acknowledges that there is a presumption that the jury followed the Court's instructions concerning the limited nature of this evidence of Newman's investigation. Nonetheless, when weighing – for *Brady* purposes – whether confidence in the verdict is undermined by the suppressed statement of Orlando Marshall, the state of the evidentiary record must be taken into account. That is, in light of the admittedly weak government case, it is reasonably probable that the outcome would have been different had the government not suppressed Marshall's taped statement.

Defendant, then, is entitled to a new trial here. His due process rights were denied by the government's failure to timely produce Marshall's July 12, 2002 taped statement. He was severely prejudiced by that failure. The only way to right this wrong is to grant Defendant a new trial, where he will have use of the *Brady* material contained in Marshall's statement.

B.    **The Government's Failure to Turn Over Marshall's Taped Statement and Other Documents Constitutes a *Jencks* Act Violation Entitling Defendant to a New Trial**.

In failing to turn over Marshall's July 12 statement, the government violated not only its *Brady* obligations, but also the *Jencks* Act, 18 U.S.C. § 3500. Where the *Jencks* Act has been violated and that error is not harmless, a new trial is warranted. *Goldberg v. United States,* 425 U.S. 94, 111-112 (1976) ("if the [trial] court concludes that the Government should have been

required to deliver the material, or part of it, to petitioner [as *Jencks* material], and that the error was not harmless, the District Court will vacate the judgment of conviction and accord petitioner a new trial") (fn. omitted).  Although a new trial is not an automatic remedy for a *Jencks* violation, *United States v. Thomas,* 97 F.3d 1499, 1502 (D.C.Cir. 1996), *United States v. Davis,* 402 F.Supp.2d 252, 263 (D.D.C. 2005), one should be granted Defendant in this case.  For the reasons discussed in Section I, above, the error here was clearly not harmless.  Defendant's defense was severely compromised by the government's failure to turn over Marshall's July 12, 2002 statement because of its *Brady* content, both in terms of containing exculpatory evidence, and in terms of its impeachment value.  Moreover, as noted above, the error committed by the government doubly violated the *Jencks* Act when one considers that the tape contained the words of Detective Tucci and Mr. Marshall.

In addition, John Karr was a government witness at trial and the government committed a second double *Jencks* Act violation with respect to reports that Karr had authored.  In his January 3, 2007 letter (Ex. C), the prosecutor wrote, as if he were doing Mr. Emor a favor, "Out of an abundance of caution, I am also providing you with internal corporate investigative reports of John Karr which contain his summary of Marshall's taped statement."

Had it had access to the reports from Karr, the defense could have interviewed Jalloh, who would have provided exculpatory material with respect to Orlando Marshall.  See Hampton Theft Investigation, Briefing #2, attached as Exhibit G.

Had the report been disclosed in timely fashion counsel would have been able to interview Abdul Jalloh in an effort to corroborate the contents of Karr's report.  For instance, the report indicates that Orlando Marshall would arrive at Jalloh's house, retrieve deliveries from UPS and drive away with computers.   Jalloh said that he purchased a computer directly from

Marshall.  Counsel would have been able to subpoena documents and telephone records from Gateway and/or Karr that were referenced in the report.

Karr prepared a second, more detailed report dated July 17, 2002, attached hereto as Exhibit H.  Here again, that report was not turned over to the defense until after trial.  This report would have been used to impeach Orlando Marshall and Karr, as well as to impeach the manner in which Karr conducted his investigation.  The report mentions that there was e-mail correspondence between Detective Tucci and Detectives in Hampton, Virginia.   Those e-mails constitute *Jencks* for Detective Tucci but, again, they were not provided to the defense.

The second Karr report could have been used to impeach Orlando Marshall in critical areas based on Marshall's July 12, 2002 taped statement.  We believe the material is also *Brady* with respect to Marshal's credibility.  It reads, "Marshall was questioned by [Det.] Tucci during the search of his residence.  Marshall advised that Dwayne Simmons at the Gateway facility was responsible for sending the merchandise to his address.  He was asked if Mike Ralph was involved with this.  He said he did not know."   Ex. H at 6-7.

Karr's second report also makes reference to UPS records that showed that 166 boxes were sent to Mr. Marshall's house in a six month period of time in or about 2001-2002.  Mr. Emor was denied an opportunity to cross-examine Marshall on this conduct because the defense had not been provided with Karr's reports.  That report would also have provided a basis for impeaching Det. Tucci concerning his statement, made during his taped interview of Marshall, "Would it surprise you if I said that you received probably about 122 pieces [from Gateway]?" Ex. D at 17.  The defense could have exploited the fact that neither Gateway, nor the law enforcement officials who investigated this case, really knew how many computers were alleged to have been stolen and thereby call into question the reliability of the investigation into this

matter on this and other points, such as the number of telephone calls allegedly made between

Defendant and Michael Ralph, a piece of evidence by which the government attempted to

implicate Defendant.

Therefore, these numerous multiple *Jencks* violations are yet another basis for granting

Defendant a new trial.

C.    **Orlando Marshall's July 12, 2002 Statement, and the Other Material Sent by the Government With its January 3, 2007 Letter, Constitutes Newly Discovered Evidence That Warrants a New Trial.**

Defendant requested *Brady* material in both his discovery letter and in a pre-trial motion.

*See* Dkt Entry No. 25.  He also requested all witnesses' *Jencks* materials.  Despite Defendant's

efforts and the government's obligations under *Brady* and *Jencks*, the government failed to

produce Marshall's July 12, 2002 taped statement, of which Defendant had no knowledge until

after trial, when the government belatedly produced it.

That statement, as argued in Section I, above, contains *Brady* material.  This evidence,

through no fault of Defendant's, was not discovered until the government produced it post-trial

on January 3, 2007.

Other newly discovered evidence was also included with the letter transmitting

Marshall's videotaped statement.  This was the two reports of John Karr, which were not turned

over as *Jencks,* even though Karr testified for the government; and the reference in one of those

reports to e-mails between Det. Tucci and police in Hampton, Virginia, which should also have

been turned over to the defense as part of Tucci's *Jencks*.

To receive a new trial based on newly discovered evidence, it must be shown that the

evidence would more likely than not lead to a different outcome.  *Boyde v. California,* 494 U.S.

370, 380 n.4 (1990); *INS v. Abudu,* 485 U.S. 94, 107 n. 12 (1998).  This Circuit has formulated

the standard as requiring a defendant to show that the newly discovered evidence would probably produce an acquittal. *United States v. Williams,* 233 F.2d 592, 593-594 (D.C.Cir. 2000) (citing *Thompson v. United States,* 188 F.2d 652, 653 (D.C. Cir. 1951)).

This standard for newly discovered evidence is, admittedly, higher than that required in connection with a *Brady* violation, as discussed above. Nonetheless, Defendant submits that even this higher threshold is met here, given the powerful *Brady* material contained in Marshall's recorded statement and the government's concession concerning the weakness of its case; and all the impeachment material contained in the Karr reports that accompanies the government's January 3, 2007 letter (Exs. A, G and H).

Thus, Defendant respectfully submits that a new trial is warranted here based on this newly discovered evidence.

**D.    The Variance Between the Timeframe Covered by the Indictment and That Presented by the Government's Case Constitutes Grounds for a New Trial.**

Finally, a new trial is warranted by the variance between the timeframe alleged in the indictment, and that adduced by the government at trial. It is critical to note that Mr. Emor, through prior counsel, filed two pleadings prior to trial in which he sought notice on material that was outside the four corners of the indictment in order to avoid unfair surprise at trial. In both a motion for disclosure of 404(b) evidence and a motion for a bill of particulars, filed on September 28, 2006 (Dkt. Entry Nos. 23 and 24), Mr. Emor sought to find out whether he needed to be prepared to defend against uncharged criminal conduct.

The government's response to his motions was just as dismissive as its response to his *Brady* letters and motion. With respect to 404(b), the government responded, "The government does not intend to present any 404(b) evidence." *See* Opposition filed on October 19, 2006 (Dkt.

Entry No. 26), page 1, paragraph 1.   With respect to the bill of particulars, the government

responded that "the indictment defines the defendant's role in the charged conspiracy in a

manner sufficient to avoid surprise and permit the defendant to prepare a defense."   It then cited

a series of cases that do not address the issues raised by counsel regarding the conspiracy.   *See*

*id*. at pages 2-3.   There was no reason for the government to fail to disclose a few simple facts

and the videotape to Mr. Emor in advance of trial so that he could adequately investigate those

facts and prepare a defense.   Instead, the government elected to ambush Mr. Emor by changing

its theory of prosecution.[8]   This variance severely prejudiced Defendant's ability to meet those

new allegations, as more fully discussed below.

    The facts underlying this issue are the same as those on which Defendant's Renewed

Motion for Mistrial (Dkt Entry No. 41-1) was based.   Defendant incorporates by reference his

earlier arguments concerning mistrial.   Although the Court denied that Motion, Defendant reads

the Court's Memorandum Order (Docket Entry No. 52), at pages 1-2, as – if not inviting – at

least not foreclosing the renewal of that issue here ("defendant will surely have the opportunity

to present his argument sooner or later, either here or in his motion for new trial  . . .")

    In denying the Renewed Motion for Mistrial, the Court notes that that Motion was based

only on a conclusory statement that "'the defense was not prepared to defend'" against the

evidence of the pre-2000 activities.   *Id* at 5.   Here is why Defendant was caught unprepared by

the government's expansion of the timeframe, and how he was prejudiced thereby.

---

[8]        Mr. Emor asks the Court to Order the government to disclose the grand jury minutes and transcripts to
counsel to examine whether there was a constructive amendment to the indictment.   The government elected not to
provide notice with respect to the new theory of prosecution.   It is well-settled the prosecutor cannot change the
theory of prosecution, if it had not presented the information to the grand jury.   *United States v. Hitt,* 249 F.3d 1010,
1028 (D.C.Cir. 2001) (Williams, dissenting) (if proof at trial "so altered an essential element of the charge that, upon
review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's
indictment," a constructive amendment has occurred) (quoting *United States v. Berger,* 224 F.3d 107, 117 (2d Cir.
2000)).

First, had Mr. Emor had access to the *Brady* and *Jencks* materials discussed above, he would have been able to use that evidence to disprove the newly alleged timeframe and the whole "Phase I" theory that the government sprung on Defendant at trial.  Second, had Defendant known that the government was going to introduce evidence about the years 1998 and 1999, he would have gathered evidence relevant to those years in order to rebut the government's allegations.  For example, he would have gathered his telephone records that pertained to those years to attempt to show that he was not talking (or at least not talking enough to support the government's claim that he was buying all those "Phase I" computers) with Michael Ralph, Orlando Marshall or Dwayne Simmons – his alleged co-conspirators – during those years.  He would have attempted to subpoena telephone records of Mr. Ralph, Mr. Marshall or Mr. Simmons to do the same.

In addition, he would have gathered his financial records from those years to attempt to show that he had no income stream from any such activities (as Defendant noted during trial, the government contends that his involvement in "Phase I" was more extensive, in terms of the number of computers he allegedly bought, than during "Phase II" – the phase covered by the Indictment) to rebut the government's claim that Defendant's main use of these computers was for resale, from which he allegedly made a lot of money.  He would have gathered pertinent bank records to attempt to show that he did not have large sums being used to buy computers during those years.  He would have focused his investigation on those earlier years, attempting to find witnesses who could rebut that he was involved during those years.  In addition, he would have attempted to subpoena bank records of Mr. Marshall, Mr. Ralph and Mr. Marshall to show that they did not receive substantial amounts of cash in that time period.

Defendant was foreclosed from doing any of that.  This was a three-day trial.  There was simply no time during that brief trial to investigate those earlier years, to obtain the requisite documents or subpoena potential witnesses.  *That* is how Defendant was prejudiced.

Together with all of the other issues raised by this Motion, the variance between the Indictment and the government's evidence at trial is yet another reason that the interests of justice require a new trial of this matter.  Defendant concedes that at a new trial, he would have notice about the government's intent to delve into the years 1998 and 1999, but at least then, he would have the opportunity to investigate those two years, and to attempt to rebut the government's allegations about those alleged activities.

## **CONCLUSION**

For all of the reasons discussed above, the government's failure to produce the taped statement that Orlando Marshall gave to the police on July 12, 2002, and the other *Brady* and *Jencks* materials referred to above deprived Mr. Emor of a fair trial.  Had that material been disclosed as it should have been there is a reasonable probability, if not a strong one, that the outcome of the trial would have been different.  Mr. Emor is thus entitled to a new trial.  In addition, the variance between the timeframe covered by the Indictment, and that covered by the government at trial, also warrants a new trial.

WHEREFORE, Defendant respectfully requests that the Court grant him a new trial.

Respectfully submitted,

SCHERTLER & ONORATO, LLP


_____/s/_____
David Schertler (D.C. Bar No. 367203)
Danny Onorato (D.C. Bar No. 480043)
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, DC  20004
Tel. (202) 628-4199
Fax: (202) 628-4177



## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically this 20th day of February, 2007 upon Assistant United States Attorney Roy L. Austin, Jr., Esq., counsel for the government.


_____/s/_____
Danny Onorato