# Exhibit H

Hampton ITSP Rev.1
7/17/02

On 5/15/02 Investigator Robert GROSSAINT and I were dispatched to the Hampton Gateway facility responding to a number of incidents where raw processors were noticed missing from manufacturing cells within the facility.

GROSSAINT and I met at the facility on Monday, May 20, 2002, and met with Brian VERSYNEN, a Production supervisor, to discuss the shortages the cells were experiencing. VERSTYNEN explained the process for material handling in Hampton, since they were using "Lean Cell" process, which differed from North Sioux City.

For the next two days GROSSAINT and I reviewed videotape, interviewed employees, and inspected documents in an effort to identify the cause of the shortages.

## The DR Packages

On 5/22/02, toward the middle of the day, VERSTYNEN advised that Christine SOUCY, the Delivery Refusal supervisor, told him that three CPU's had been returned, all going to the same address in Virginia, but built for three separate clients on the East Coast. GROSSAINT, VERSTYNEN, and I went to the DR department to inspect the boxes.

We first noted the UPS shipping labels haphazardly affixed to the top of the boxes. The area typically reserved for the sender's information indicated HVU Department in Hampton. The HVU department is normally responsible for sending bad component parts back to their vendors. VERSTYNEN immediately identified the label as a coming from a UPS Maxiship or Worldship machine within the facility. The shipping address indicated that all three were to be delivered to an Ahmed GARBA, Apt. B, 13100 Tall Shadow Lane, Annandale, VA 22003. We confirmed that the serial numbers matched the packing list stickers affixed to the sides of the boxes. This name and address were checked through the order-entry system for orders. None were found. Further investigation determined that the package was picked up from Gateway on 5/10/02 at 1755 hours. We reviewed Maxiship records going back to April 2002 and discovered a number of shipments with similar characteristics. (Who were the original recipients of the systems that had been returned? Where were these systems supposed to have been?)

## The Shipments

VERSTYNEN, GROSSAINT and I reviewed the label generation history within the Maxiship machine. This historical search could only identify activity beginning as far back as 4/15/02. This review discovered that 36 packages, weighing 40 pounds each, were sent to various addresses in Maryland, Virginia, and Washington D.C. with the last shipment occurring on 5/20/02. Recipient names and addresses of these packages were checked against the order-entry system to determine if any of the addressees had ever placed a legitimate order with Gateway, or if any of the addresses had ever appeared in our system. No orders were found in our database that would explain these shipments. In an effort to determine who was using the Worldship machines, we focused video cameras in the area to surveil record activity at the CHS Worldship machine and the staging area from where these CPU's are noticed missing.[1] We also inspected the Shipping department's Worldship machine for any suspicious shipments. We found one shipment of three 40-pound boxes going to Advance Computer Center, Inc. in Washington D.C. The order-entry system did not show any reason for these items to have been shipped to Advance Computer Center. A camera was also tasked to this area to identify any further shipments made.

---

[1] Once daily, scheduling employees inventory on hold CPU's for lack of monitors or other issues to know exactly what they have. These stacks are sorted by the issue holding them. This is where all of computers have been noticed missing.

A further review of these shipments found that one of them had been placed on a UPS truck between 11 am and 2 pm, indicating this activity was probably occurring during the day shift. We reviewed video of several areas on the manufacturing floor to try to identify those responsible for this activity. On 4/26/02 fourteen 40-pound boxes were sent to suspicious addresses. Upon reviewing the video on that date, an unknown individual was observed taking two CPU boxes from a holding area and placing them on the Autosort machine. (Any chance that now we know Simmons was involved, this was him?) The CPU's were in an area reserved for systems waiting for parts. It was also observed that they were placed on a conveyor that by-pass Auto-Label machines, allowing them to circumvent the process used for normal shipments and sending them directly to UPS trucks.

**Interception**

While inspecting the UPS records for these shipments we noticed that a total of nine 40-pound boxes were sent to addresses in Hyattsville, MD and Washington D.C. on 5/20/02. We contacted Mark COLLINS, of UPS Security, in hopes of holding any further shipments to the addresses in Hyattsville to allow for a controlled delivery by law enforcement. COLLINS checked UPS records and found that all but two boxes had already been delivered. Those two boxes were mis-sorted and were rescheduled for delivery on 5/23/02 to one address in Hyattsville. Since it appeared that these shipments were not legitimate and in order to present the case to law enforcement, both GROSSAINT and I traveled to Hyattsville, MD that night, 5/22/02 to meet the next morning with COLLINS in Laurel, MD.

Another address that had been found in a number of these suspicious shipments was in the 1100 block of 6th Street Northwest, in Washington, DC and identified as Sunrise Academy. Prior to meeting with COLLINS we traveled to the 1100 block of 6th St. NW to determine the nature of the delivery address. This address appeared to be a single family residence with no visible signage to identify it as the Sunrise Academy.

We met COLLINS in Laurel and traveled to Hyattsville to inspect the Gateway boxes intended for delivery. COLLINS arranged for a meeting with the driver, Craig FABINA, at a designated location for this inspection. We met with FABINA and asked him about the deliveries he had been making.

FABINA advised that he had delivered a lot of Gateway boxes to addresses on 64th Avenue over a lengthy period of time. He said that he would attempt to make a delivery to 3805 64th Ave. where a small note would be visible indicating that the delivery should be made to 3813 64th Ave., the residence of ABDUL (LNU). According to FABINA, ABDUL gave him his cell phone number in case anymore shipments arrived. FABINA retained this piece of paper and surrendered it to us with the phone number of 301-943-2608. He said he asked ABDUL why he was getting so many computers. ABDUL told him that he was sending them back to his country. FABINA thought that ABDUL was from Jamaica or Africa based on his accent.

We inspected the two Gateway boxes that FABINA had on his truck for delivery. These boxes contained one CPU each, security tape intact, where the side label indicated the original order number, the serial number of the CPU, and the legitimate billing and shipping addresses. The shipping label on top of the box had the shipping address of 3813 64th Ave., Apt. 1, Hyattsville, MD 20784 to M. JALLOH and was 1 of 3 boxes in this particular shipment. Information suggests that one of the original three computers in this shipment was delivered two days previous. The serial numbers of the two CPU's involved were 0026963275 and 0026961873. COLLINS confiscated these computers in the event that they were needed for a controlled delivery. Given the original shipping address of the real client on the side of the box, it was clear to us that this shipment was an attempted theft. We confirmed this by looking in the original order for text that would explain why it was delivering to Hyattsville, MD. There was none.

We determined that the Prince Georges County Sheriff's Department actually had jurisdiction over the area that these computers were being shipped. We then traveled to the Sheriff's department and met with Det. Carrie PRYCE. We briefed PRYCE on what occurred and provided her documentation of the shipments to Hyattsville. She requested a list of all computers that were believed to be missing. We contacted Thomas RIDDICK, Hampton Manufacturing Manager, and he faxed us a list of serial numbers that were compiled by our Scheduling staff of systems that could not be found. We provided that list to detective Pryce. She took the information and advised that she would evaluate the case and get back with us. She also indicated that a police report needed to be made to the Hampton Police to establish that the systems were missing from Hampton, Virginia. GROSSAINT and I returned to the Hampton facility late that night and reported the theft to the Hampton Police Department.

The next morning, I returned to Washington D.C. to try to report the Washington DC deliveries to a law enforcement agency with jurisdiction in Washington D.C., without success. We also attempted to coordinate a controlled delivery for early the following week which would allow law enforcement to witness the acceptance of the stolen merchandise. I returned to Hampton later that night and stayed the weekend.

## The Shipment History

We made a request with UPS to provide us with the billing history for the 12W290 shipper number. This history would identify shipments originating from the two Worldship machines located in the Shipping and Customer Hardware Support (CHS) areas. Since our initial search was limited to shipments from 4/1/02, we asked that they collect these records from 1/1/02 to the current date.

In response to our request, UPS returned 833 printed pages that represented the billing history for these two machines from January 2002. Since the previously shipped 39 packages were entered at 40 pounds each and the shipments were missing a valid order reference number, this would be our starting point. After manually examining these records, we found that 547 boxes had been sent to various addresses on the East coast, none of which were our clients. The addresses we had identified from our previous search were found to have received hundreds more boxes in some cases.

We provided this information to Det. PRYCE and Det. BORDEAUX. Det. PRYCE was getting close to executing her search warrant on Abdul JALLOH'S residence. We learned that Det. PRYCE had interviewed the UPS driver who said that he had been making deliveries there since Christmas. She also advised that he was employed as a social worker with Washington D.C. Child and Family Services.

Since this shipping activity was evident in January 2002, we asked UPS to provide the billing histories since June of 2001. From these records we were able to identify 1,061 packages of varying size shipping to names and addresses of people who are not listed in our order database as being customers. The first shipment noticed occurred on 5/29/01. It consisted of eight boxes with a total weight of 200 pounds shipping to C. EMORE, 6700 Bellcrest Road, Hyattsville, Maryland 20782.

## The Data Investigation

Endeavoring to identify those within the Hampton facility that could be responsible for this activity, various records were examined. Names and addresses of our employees were looked at for ties with the suspect shipments. While a couple of employees reported addresses in the same areas where shipments delivered, one employee actually had a package sent to his house which will be discussed in another paragraph. Names of employees in close proximity to deliveries were researched for two generations (what do you mean?) looking for connections. Nothing definitive was found.

Using the dates of the shipments, we obtained and analyzed time clock records to identify employees who worked these dates. In addition to this, we asked Human Resources to provide a list of employees

whose work instructions included the use of the Worldship machine. We combined these lists and identified those common to both. With this refined list of employees we obtained and examined employment files for useful information. A few employees were identified as having ties to the Washington D.C. area. Others had disciplinary actions or seem to be disgruntled which could possibly serve as a motive. The address histories of those employees were researched thoroughly for ties to the suspect delivery addresses. Nothing definitive was found.

### Jeff Barney

As I mentioned previously, our examination of the shipping records identified a suspicious shipment to an employee. On 12/18/01 a shipment was sent to J.S. People, 1259 Corkwood Circle, Chesapeake, VA 23320. The package was entered as 25 pounds. The tracking number was 1Z12W2900357802110. The package was delivered on 12/19/01 at 1611 hours to someone named Elliot. I searched this address through our employee address data base and found that it belonged to CHS Manager Jeff BARNEY. I researched BARNEY'S ordering history with the company. He has multiple client ID's, all of which were checked in our ordering and technical support databases. I can find no reason why this package was sent to his address.

We examined BARNEY'S employment file and searched public record databases. In BARNEY'S employment file he lists a professional reference of Anna CASEY-PEOPLES, who he identifies as a Pharmacist. We also found that a suspicious shipment of six packages was shipped to George PEOPLES in Baltimore, Maryland on 5/13/02. Given the similarities of the names, we researched Anna's and Georges' backgrounds thoroughly. We could find no link between Anna and George.

Given the above, the only way to determine why one 25 pound package was sent to BARNEY'S address is to talk with him at some time to come to a resolution on this discovery.

### Search Warrant – Hyattsville, MD

With the records provided by UPS and interviews conducted with the driver, Det. PRYCE executed a search warrant on 6/19/02 with the assistance of the Prince Georges County SWAT team. It was our intention that after this search warrant was completed and a confession was gathered from JALLOH, we would be able to interview those at Gateway responsible for the shipments. This confession was not forthcoming.

Det. PRYCE advised that the residence was empty at the time of the search which required her to call JALLOH on his cell phone to advise him that his residence had been broken into and he needed to meet her at his residence. It took JALLOH approximately two hours to arrive. Once there, he was arrested for receiving stolen property and taken into custody. PRYCE said that she believed that JALLOH contacted a lawyer in the extended period of time between her initial phone call to him and his arrival since he said that he had a lawyer and would not talk with them about the shipments. She feels that JALLOH'S sister, Binta, who lives next door, more than likely notified him of the activity. (This is an assumption and has no bearing on our investigation.)

PRYCE said that they confiscated a number of computers, computer related merchandise, empty Gateway boxes, and papers from the residence. We did not know at that time whether or not the computers seized were actually ours or not. (Why is this pertinent?) They told us that they appeared to be a pieced together from several manufactures. (Why is this pertinent?) The boxes in the residence did have JALLOH'S name and address affixed.

JALLOH was taken to the police department for questioning (by whom?), but would not say anything until his lawyer arrived. After conferring with his lawyer, JALLOH advised that the computers were being sent to his address by a person named Orlando MARSHALL. According to his statement, JALLOH met

MARSHALL at a night club in Washington D.C. called the Zanzibar Club some time ago where MARSHALL asked if he could have computers sent to JALLOH'S address in Hyattsville, Maryland. JALLOH agreed but said that he didn't receive any boxes, that he would find MARSHALL outside his residence placing empty Gateway boxes in the trash dumpster after he accepted the delivery. JALLOH said that he would place the unpackaged computers in his vehicle and would leave. JALLOH said that he removed some of the boxes from the dumpster and put them behind his couch to act as a buffer between that and the wall. JALLOH then provided a cell phone number for MARSHALL, 202-271-9423, saying that he has been trying to contact him for approximately a week to no avail.

**Orlando Marshall**

I called Det. BORDEAUX in Hampton, VA to advise him of what occurred in Hyattsville. He took MARSHALL'S information and quickly determined that he was from the Hampton, Virginia area. We ran MARSHALL through every resource at our disposal (that's a pretty wide net. Why not just say, investigation found that he had not worked for Gateway) and found that neither he nor any member of his family (how did we determine that no member of his family worked for us? How about cousins, nephews, in-laws, etc?) had been employed with Gateway. The addresses reported by him in the Hampton area were checked against our employee's home address information and no match was were found not to match. Going further, (going further to where?) the address currently reported by MARSHALL in Washington D.C., 103 G Street, Apartment B109, Washington D.C. 20024, was identified as receiving approximately 169 packages from September 2001 to March 2002 to many (how many and which names?) different names. Det. BORDEAUX sent a court order to Sprint subpoenaed for MARSHALL'S cell phone records from Sprint PCS the beginning of 2002 in hopes of finding a connection to an employee in Hampton. (What kind of connection? Calls?)

While waiting for this information, (No need for a transition) BORDEAUX and I identified shipments going to addresses in and around Hampton. We visited the delivery addresses in Chesapeake, Portsmouth, and Suffolk where I would introduce myself and ask about the shipments. (Too much information, just say you interviewed occupants. I have to assume when you talk to someone you introduce yourself. You don't need to go into that much detail.) Of the three addresses we visited, two had people at the residences who denied receiving the shipments; the third was abandon every time we visited. (What were the addresses, who were the people denying they had received packages, at which address did you consistently find no one home?) The two individuals we spoke with, Dwayne Mitchell and Tony Spruill, had vehicles in their driveways with firefighter license plates on them. This allowed us to theorize that perhaps the employee responsible had something to do with firefighting, either volunteer or professional. We asked Hampton management if any employee had that type of background. None were identified. I then searched the Hampton facility's parking lot for any vehicles that had those types of license plates. None were found. (I'm not sure you have to explain all the non-productive rabbit trails you pursue, but it could go to show thoroughness.) BORDEAUX decided then that the best way to proceed would be with a search warrant.

Shortly after our visits, BORDEAUX received the cellular phone record history for MARSHALL. We determined through examination that quite a lot of calls were placed to the Hampton area. Of the calls to Hampton, most were placed to and individual named Michael RALPH. BORDEAUX ran RALPH'S criminal background and discovered that he's had a lengthy relationship with law enforcement. Charges range from harassing phone calls to embezzlement to threats to kill. We could find no links between RALPH and our employees at the time.

**Washington D.C.**

During our investigation Det. BORDEAUX had been trying to make the proper law enforcement contact in Washington D.C. His determination paid off when Det. Vince TUCCI with the D.C. Metropolitan Police Department, Financial Crimes and Fraud Unit, returned his call about the case. BORDEAUX advised TUCCI of the particulars and emailed documents to him. Shortly after we decided

to personally visit with TUCCI in Washington to discuss the case in detail. After this discussion we drove by the addresses in Washington D.C. to get proper descriptions for search warrants. (This paragraph is far too dramatic. An investigative report should be an objective reporting of the facts, not conjecture, not theories, only the facts, mam.

Later in the day (what day?) we asked Det. PRYCE if we could inspect the items seized during the search of JALLOH'S residence. BORDEAUX and I inspected these items and determined that all of the computers were indeed Gateways. Their serial numbers matched to our list of missing computers compiled by the Scheduling department. Additionally we found an empty speaker system box with a label affixed showing that it was to be delivered to Orlando MARSHALL in Washington D.C. We also found an apparently new Gateway flat screen monitor. According to PRYCE the computers will be sent to the forensic laboratory for analysis. (Which serial numbers? How many computers? Too much flowery language and not enough facts.)

I returned to North Sioux City, and continued to review shipping information being retrieved from UPS.consistently getting reports from UPS on shipments that occurred in the past and following leads where possible. We learned Det. TUCCI would be doing a search warrant on or about 7/10/02 at MARSHALL'S home address of 103 G St. SE. I traveled to Washington D.C. on 7/9/02 to be available if needed during the execution of the warrant. When I arrived I learned that the search warrant would not be done until 7/12/02. I traveled to Hampton, Virginia to assist BORDEAUX with his searches of the delivery addresses in Suffolk, Chesapeake, and Portsmouth, Virginia.

## Chesapeake and Suffolk, Virginia

Det. BORDEAUX, in concert with the Chesapeake Police Department executed a search warrant at 2134 Chesterfield Loop in Chesapeake. (When?) According to UPS records, eight boxes were sent to this address on 2/27/02 from Gateway to the attention of James Lee. They were delivered on 2/28/02 and signed for by "Lee".

Det. BORDEAUX advised that he found a Gateway computer with serial number 0026124075 which the owner, Stacey ORTON, said he purchased from an unknown black male in the parking lot of a gas station in February. ORTON advised this purchase was arranged by a school friend named KJ (I assumed we've searched employee names for these initials, both as first and middle and first and last.) who said it was an employee discount. In the midst of searching the residence the detectives discovered approximately one pound of marijuana. (How do you know it was marijuana?) Later on they discovered another pound of marijuana in ORTON'S vehicle. ORTON was arrested on drug possession charges.

The next day BORDEAUX, with the assistance of the Suffolk Police Department visited the residence of Dwayne MITCHELL at 501 Miller's Court in Suffolk. They talked to Mr. MITCHELL where he again denied receiving anything from Gateway. UPS records indicated that eight boxes were sent to this address to the attention of Sandra Cummings on or about 2/8/02 from Gateway. Mr. MITCHELL consented to a search of his residence. No computer merchandise was found.

## Search Warrant – Washington D.C.

On 7/11/02 I met with Det. TUCCI in Washington to discuss the schedule of events for the execution of the search warrant at MARSHALL'S address. TUCCI advised that two agents with the Social Security Administration, three agents with the Secret Service, one agent with the FBI, and two detectives from his office would be involved with the search warrant. The warrant was executed at approximately 0715 hours on 7/12/02.

MARSHALL was questioned by TUCCI during the search of his residence. MARSHALL advised that Dwayne SIMMONS at the Gateway facility was responsible for sending the merchandise to his address.

He was asked if Michael RALPH was involved with this. He said he didn't know. I called our Hampton facility minutes after learning of SIMMONS. I asked that he be put under video surveillance until we had time to question him. Later I learned that he voluntarily resigned from the company as a Shipping Supervisor on or about 5/10/02. I also called BORDEAUX to ask him to put surveillance on SIMMONS' residence which he said he would arrange. Some financial documents, a day organizer, and a bb pistol were taken from MARSHALL'S residence.

MARSHALL was not arrested but was asked to meet with TUCCI later in the morning to give a statement. MARSHALL is employed as a social worker with Washington D.C. Child and Family Services.[2] He had to attend a court case later that morning.

## The Statement

MARSHALL arrived at TUCCI'S office where he was taken to an interview room to make his statement. MARSHALL advised that sometime last year he and his close friend RALPH were talking where he was introduced to RALPH'S friend SIMMONS. The conversation eventually got the point where RALPH and SIMMONS asked if MARSHALL if could he thought he could find buyer's for complete computer setups for $400 a system. MARSHALL agreed and began to act as a broker. He would find buyers, contact RALPH with the names and addresses of those buyers, collect the money from the buyers, and drive to the Kings Dominion parking lot in Virginia to give RALPH the moneys collected. RALPH would occasionally give MARSHALL $50 to $100 depending how big the order was. Typically a limit of two complete systems would ship to an address on one day to avoid too much attention.

In regards to JALLOH, MARSHALL made contact with him through work where eventually JALLOH became a broker of RALPH. MARSHALL said the JALLOH asked if he could have some computers sent to his address in Washington D.C.. In most cases JALLOH would pick up the systems from MARSHALL'S address. In one case however, MARSHALL said that he had taken a complete system to JALLOH'S residence in Hyattsville, Maryland. This is consistent with the box found in Jallho's residenceexplains why during our inspection we found a box at JALLOH'S residence with MARSHALL'S address information on it. MARSHALL didn't know where JALLOH was sending the computers, he thought it may have been overseas. MARSHALL advised that JALLOH'S buyer must have been big given the volume of shipments he aswe receiving.

MARSHALL was also responsible for Charles EMORE'S involvement in this activity. According to MARSHALL, he and EMORE were coworkers at a school, this relationship continued while EMORE started got his daycare center up and running. EMORE eventually began to act as a broker for RALPH with unknown buyers.[3]

MARSHALL advised that he was also responsible for setting up buyers in New York and other address within Washington D.C.. He said he was getting tired of setting up these deals and getting next to nothing for doing it. He asked that shipments not be sent to his address any longer. According to UPS records the last shipment to his address occurred on 3/18/02. A total of 166 boxes were sent to his address during a six month period of time.

MARSHALL advised that knows that another person within Gateway is helping SIMMONS but doesn't know who that individual is. I asked him if he contacted anyone about the search warrant that was just donehad been executed at his residence. He said he called RALPH to give him a heads up and told him we knew his name. MARSHALL then received a call from EMORE asking him about what happened. MARSHALL told him the situation where EMORE supposedly said that there is no reason to do a search

---

[2] The same employer of Abdul JALLOH.
[3] On 6/20/02 GROSSAINT talked with Moe SUBHANI from Dupont Computers about the shipments they received on 3/28/02. SUBHANI after talking with his partner Nidal SHAER said that they bought the computers from Charles Emore from the Sunrise Academy.

warrant at his business because he id notdoesn't have anything there. Apparently after the search warrant was run at JALLOH'S residence on 6/19/02 he called MARSHALL to inform him that the police ransacked his apartment and broke in his door.

MARSHALL'S statement was recorded on video and audio tape.

### Dwayne Simmons

I asked for and received information about SIMMONS and his employment with Gateway. He was hired in our shipping department as a Senior Clerk in March of 1997 and eventually promoted to supervisor reporting to Joe COSTELLO. In Hhis application he edlists three references, Moses WARE, a Senior Manufacturing Engineer at the facility; Michael RALPH, who he indicated he worked security with at Clarence WILLIAMS Entertainment; and Terrance BAILEY, an Army Specialist.

According to his exit interview paperwork, he was concerned about the future of Gateway and the job market. He started work for a distributor of beer cans for Anheuser-Busch called Ball Metal in Williamsburg, Virginia.

### The Federal Case

Given the interstate component of this case, TUCCI contacted the FBI in Washington D.C.. They are interested in the case and have talked to the United States Attorney. In the near future they plan to collect RALPH and SIMMONS. We also understand that discussions are occurring with JALLOH and EMORE.