UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Cr. No. 06-64 (JR) |
| v. : | |
| : | |
| CHARLES EMOR : | Sentencing: March 16, 2007 |
| Defendant. : | |

GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION FOR NEW TRIAL

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully requests that the Court deny defendant's motion for a new trial because nothing in Orlando Marshall's taped statement would change the guilty verdict. First, the defendant's entire scatter-shot motion suffers horribly by his new counsel's unfamiliarity with the case as he repeatedly makes arguments that are contradicted by the testimony at trial and the discovery provided to former counsel.[1] Second, the audio and videotaped statement of Orlando Marshall would not change the outcome because it was fully consistent with the other discovery

---

[1] As just one example, the defendant states that "[i]f the jury would have credited the exculpatory information, it would have eviscerated Mr. Marshall's trial testimony that Mr. Emor received the bulk of the computers in this scheme." Motion at 9-10. Marshall never testified that the defendant "received the bulk of the computers." This was Ralph's testimony. Marshall testified that he introduced the defendant to Ralph in 1998 and he handled one early transaction and otherwise did not deal with the defendant and the scheme until Marshall spoke to the defendant in the midst of the execution of a search warrant on Marshall's apartment. The rest of this Opposition is replete with additional examples.

provided to defense counsel before trial. And third, even if the Court were to find some difference between the taped statement and the trial testimony all it would have potentially led to was further impeachment of an already viciously impeached minor witness.

**Summary of Relevant Facts**

From December 18, 2006 through December 20, 2006, the government presented thirteen witnesses that fully supported its charge that the defendant conspired with others to obtain stolen Gateway computers between December 2000 and May 2002. As the government argued in its closing argument, "[t]he single question before [the jury] is, did this man know that all of the computers he was getting were stolen." Trial Transcript at 561:4-5. Orlando Marshall's most significant role in this conspiracy was that he introduced the defendant to Michael Ralph. The defendant acknowledged this fact. Beyond that, the evidence against the defendant consisted primarily of the testimony of Ralph, the defendant's repeated phone calls to Ralph, the defendant's own checks and the testimony of those to whom the defendant directly shipped the stolen computers and/or to whom he re-sold the stolen computers.[2] Marshall was a minor player in the case against the defendant.

---

[2] The defendant exaggerates the import of the government's argument near the end of its case-in-chief that a Court ruling barring the use of certain summary evidence "eviscerates the government's opening statement and much of this case." Tr. 428:9-10. What the defendant fails to mention is that the government told the Court during the same exchange that it did not believe that the ruling ended the government case because "I think the government certainly has a circumstantial case by the indictment. Again, I think that the case is substantially smaller than the case that the government presented in its opening statement. But according to the indictment and the overt acts in the indictment, all the government has to show is that Mr. Emor knowingly participated in the purchase of or obtaining Gateway computers. That's all the government has to show." Tr. 44: 3-11. The defendant also conveniently fails to note the Court's ruling on the defendant's motion for judgment of acquittal: "I think Mr. Austin is right. I think there's a pretty convincing circumstantial case of something here. I don't know–if it's only computers and checks, but the evidence, through Marshall and Simmons and –what's the first guy's name, Ralph, of his involvement in the conspiracy and scheme is pretty strong circumstantial evidence. Motion denied." Tr. 463:8-14.

After the verdict, while the government attorney was cleaning up the case files, he found an audio and videotape of the statement Orlando Marshall gave to investigators the day his apartment was searched. The government attorney never listened to this statement and had set it aside intending to duplicate it for defense counsel. As soon as practicable, the government told new defense counsel about this Jencks and provided it with a letter the next day.

I.  The "three critical statements" cited by the defendant cannot constitute Brady violations because the defendant was fully aware of each issue from the discovery provided before trial.

From an hour-long taped interview of the most insubstantial of the three cooperating co-conspirators, the defendant found just three brief statements that he claims would have altered the trial. As shown below, none of these three "issues" were new to former defense counsel and as such would not have affected the trial in any way, shape or form.

A.  Because the defendant's "three critical issues" are consistent with previously provided discovery, his motion should be denied.

The defendant claims that had he known before trial that Marshall said that the defendant "was reselling computers. He was pretty much buying them at wholesale rate from them and reselling them[]" that the trial would have had a different result. It appears that the defendant believes that Marshall was saying that the defendant's price was a Gateway factory "wholesale rate." All Marshall was saying, completely consistent with the discovery and rest of his trial testimony, was that Ralph gave the defendant a volume discount. According to the dictionary, "wholesale" means "[s]old in large bulk or quantity, usually at a lower price." Websters II New Riverside University Dictionary 1994. The defendant completely misconstrues this statement when he equates "wholesale" to "Gateway employee discount." Motion at 12. All wholesale means is cheaper because of volume. Marshall had no way of knowing what Gateway's true warehouse price was and

-3-

the only way Marshall knew that the defendant paid Ralph at a volume-discounted rate was because that was what Ralph told Marshall. During trial Ralph was asked about the amount Emor was paying:

> Q: Now, how much were you charging Charles Emor when you were getting computers during this second phase?
> A: If he got the high-end computers, he would pay 550. If they were mid-range, he would pay 450, sometimes 350.
> Q: Was this the same price that other customers of yours were paying?
> A: No.
> Q: Was his price higher or lower than that?
> A: His price was always lower because of the quantity that he received. Tr. 142:8-17.

The defendant was well aware of this information from the Postal Inspector's Memorandum of Interview ("MOI") of Ralph. Exh. #7 (Ralph MOI). At trial, Marshall was not even asked about what the defendant paid because it was hearsay. And Marshall's statement could not have been used to impeach Ralph, because it was entirely consistent with Ralph's testimony.

> B. The defendant misstates the relevance of and overstates the importance of the defendant's post-search warrant conversation with Marshall.

In Marshall's taped interview, he tells the detectives how he just spoke with the defendant and the defendant claimed that he did not have any "merchandise." Just looking at the plain language of Marshall's taped statement, if the defendant, who claimed at trial through counsel that he purchased the Gateway computers for his school, told Marshall that he had no computers at his school, then the defendant's statement described by Marshall is completely inculpatory–an intentional lie. There was never any disagreement at trial that the defendant used some of the Gateway computers for the school. Consider the testimony of Ahmed Gabr, the defendant's IT employee during the relevant time period:

> Q: Now, did you ever have a conversation with the defendant about Gateway computers?

> A: Well, actually, I installed several of them in his school, and I told him, you know, these look really nice systems. How much you got them, and how did he get them. And he said, yeah, he knows somebody, I think at Gateway, can get them discount for these systems. Tr. 301:15-21.

It is unclear how Marshall's description of what the defendant told him is in any way exculpatory. In fact, had the government known the content of Marshall's taped statement prior to trial, the government would not have needed to call Detective Tucci as a witness "to corroborate whether a conversation took place between Orlando Marshall and Charles Emor." Motion at 16. The significance of Marshall's conversation with the defendant was mostly that Marshall spoke with all of the co-conspirators in the midst of the execution of the search warrant at his apartment.

Ralph, who testified before Marshall, fully corroborated Marshall's trial testimony concerning his conversation with Emor. Ralph testified as follows:

> Q: So after you received this information from Mr. Marshall, what did you do with this information?
> A: I called Emor and informed him as well that FBI agents had went in on Pop, and he was, like, he didn't need that today. And he told me he would get back with me. But maybe less than 10 minutes later he called me back and he wanted to know what took place, and I told him, and he stated to me, such as he always did, he said, "man, your guys are really fucking up." He said they need to get their stuff together. And he called me and asked me for Orlando's address – I mean telephone number, and him and Orlando communicated at that point.
> Q: Did they three-way you on that conversation?
> A: No, sir. . . .
>
> Q: What did he say about the possibility of getting caught?
> A: Mr. Emor?
> Q: Yes.
> A: He in return replied that he was going to say that he purchased the computers legitimately, and he had – for a couple of days he refused to take them out of his school because he had furnished his entire computer lab with them. Tr. 155:10 - 156:12.
>
> Q: According to what you told Agent Newman, you said that Mr. Emor told you that he had receipts – that he had purchased these legitimately and he had receipts. Correct?

-5-

    A:    That's what he said.  Tr. 172:18-21.

    C.    <u>Since Marshall's taped statement that he put Ralph in touch with the defendant and otherwise had no involvement with the two's dealings is consistent with the discovery provided, the taped statement could not possibly constitute a Brady violation.</u>

The subject of the defendant's third "critical issue" was provided to the defendant in discovery prior to trial. The defendant rightly states that Marshall stated during his taped statement that "he put his cousin Mike Ralph 'in touch with Charles Emor . . . [a]nd they made those purchases on their own. I had no involvement [in that aspect of the conspiracy].'" Motion at 5. In Marshall's "Statement of Offense" that was provided to the defendant on October 30, 2006, Marshall adopts the following statement: "In the latter part of 2000, I introduced my cousin, 'M.R.,' to an acquaintance of mine named C.E. M.R. subsequently told me that he had been selling stolen Gateway computers to C.E." Exh. #4 (Statement of Offense) at 1. There is no further mention of the defendant in Marshall's Statement of Offense. It is not clear what the defendant is now arguing since Marshall's "Statement of Offense" is indistinguishable from the taped statement.

II.    <u>With the taped statement, the defendant could not have completed an any more "devastating" impeachment of Orlando Marshall.</u>

Since the taped statement was consistent with the other discovery provided and defense counsel spent virtually his entire cross-examination showing Marshall to be a liar and a perjurer, nothing more could have been gained against Marshall. In his motion, the defendant lists four subjects that are less than "critical" but would have changed the result of the trial because they would have permitted defense counsel to conduct a "devastating impeachment of Mr. Marshall." Motion at 5. Most importantly, each of these four subjects were consistent with the discovery provided to defense counsel.

First, the defendant would "impeached [sic] Mr. Marshall with respect to the amount of money he personally profited, whether it was $1,000 or $40,000." Motion at 6. New defense counsel completely misinterprets the quote it pulled:

> Q: Over the course of this whole operation, as you were involved in it, would you be able to tell me, or estimate, how much money you received as a result?
> A: I would say, probably, I can say maybe 40,000 dollars.
> Q: You received 40,000 dollars?
> A: Approximately. Oh, for myself?
> Q: Yea
> A: Oh no, no. For myself I got maybe $1000 of that.

As is clear from this quote, Marshall was saying that he received a total of $40,000 from different purchasers of which he kept "maybe $1,000." As was clear to those who participated in the trial, Marshall testified that he gave the rest of the money to Ralph–which is consistent with his MOI which was provided prior to trial. Exh. #6 (Marshall MOI). Nonetheless, former defense counsel did everything that could be done in this area. The government elicited the following during Marshall's direct examination:

> Q: How much did you personally financially profit from this?
> A: I would say, a high number, maybe eight or nine hundred dollars during the whole course of this thing. Tr. 232:23-25.

Defense counsel cross-examined Marshall for more than a full transcript page on this exact issue. Tr. 261:23-263:2. On re-direct, the government continued the discussion on this issue:

> Q: On direct examination, you said you'd made about $900. Isn't that correct?
> A: Yes, sir.
> Q: And on cross examination, you were asked about a thousand dollars. Is that correct?
> A: Yes, sir. Tr. 267:8-13.

Second, new defense counsel argues that there is something "devastating" that it could do with the fact that Marshall "could not recall receiving 120 boxes in a six month period of time." Motion at 8. In the taped statement Marshall was asked and responded as follows:

> Q: Would it surprise you if I said that you received probably about 122 pieces?
> A: I didn't think it was that many. I mean I never kept a count but, you know, they were coming pretty regularly. Um, you know, sometimes four in one week. Not at the same time but they were coming pretty steadily.

Again, new defense counsel misses the clear point of the taped statement and that it is consistent with the discovery timely provided. All Marshall is saying in the taped interview is that he was surprised by the number of boxes he received because he "never kept a count." At no time does Marshall deny that he received this number. In his Statement of Offense, Marshall acknowledges that he has "no basis to disagree with these shipping records." Exh. #4 at 2. Marshall's statement in the Statement of Offense is consistent with his statement in the taped interview. And, beyond that, there is no "devastating impeachment" that could have been done on Marshall simply because he "never kept a count" of his illegal activity.

Third, new defense counsel wrongly states that it would have had more impeachment material to work with since Marshall says in the taped statement that most of his illegal business dealings were with co-conspirator Abdul Jalloh. Motion at 8. Former defense counsel knew from the discovery timely provided that most of Marshall's dealing were with Jalloh. In Marshall's Statement of Offense, Jalloh (initials A.J.) Was the only person Marshall listed by name as a person from whom he took orders. Exh. #4 at 1-2. A similar statement can be found in Marshall's information. Exh. #5 (Marshall's Information) at p. 2 para. 9a. Former defense counsel also had Jalloh's Information that repeatedly describes Marshall's relationship to Jalloh and makes no mention of any of the other co-conspirators. Exh. #7 (Jalloh's Information). And Marshall's trial

-8-

testimony concerning the defendant, Jalloh and phase two was completely consistent with the taped statement:

> Q: And did computers start coming to your house [sometime between 2000 and 2001]?
> A: Yes, they did.
> Q: And were these computers for the defendant?
> A: No, they weren't
> Q: And what were you doing with these computers?
> A: . . . At one point Mr. Abdul Jalloh approached me, and he had heard from a coworker about the computers. He told me that he had somebody who was willing to purchase computers in large volumes.
> Q: So did you end up then providing computers to Mr. Jalloh?
> A: Yes, I did. Tr. 229:24-230:15.

Fourth, and finally, new defense counsel says that the taped interview could have been to used to impeach Marshall on his testimony at trial that the conspiracy started in 1998. Former defense counsel spent the majority of his cross-examination in a withering attack repeatedly calling Marshall a liar and perjurer for telling the case agent and testifying under oath that the conspiracy started in 2000. Exh. #2 Tr. 252:7 - 259:2; 260:23-261:25. New defense counsel acknowledges that former defense counsel "had other means of impeaching Marshall on [this] question. Motion at 10. There was absolutely nothing more that new defense counsel could have accomplished with the information in the taped interview.

In his closing argument, former defense counsel summarized the testimony of Marshall as follows:

> And you know what they want you to rely on? They want you to rely upon two witnesses who are mor then admitted thieves. And you know, as a little boy when I was growing up, my family used to always say to me, the one reputation you never want is the reputation as a thief. Because once people know that you're a thief, they know that you would do anything to take property that doesn't belong to you. You know, in other societies they whack off and cut off the hand of thieves because they're such despicable people.
> Next to a thief is a liar. Now, these aren't my personal beliefs. I'm not sitting here trying to give you thoughts on that. But they told you they were liars. . . .

>So they lied. They lied to them. And you heard all of them say that lying to a federal agent is a crime. They're not being prosecuted. . . .
>
>A witness who realizes that he may be able to obtain his or her own freedom, which is exactly what they're doing, that he or she may be able to obtain their own freedom or receive a lighter sentence by giving testimony may have a motive to lie.
>
>Now, if you couple that with the fact that they're admitted liars, I'll continue.

Exh. #3 Tr. 571 - 585 (Defendant's closing argument).

There is nothing "more devastating" that new defense counsel could do or say about Marshall.

Defense counsel makes a big deal about the fact that it would have been able to show Marshall lying on videotape. This argument might make sense if, during trial, Marshall did not admit that he lied when he spoke to investigators and when he pled guilty. The videotape would just be cumulative evidence of Marshall's admitted lies and certainly would not be more powerful than his admission that he perjured himself during his plea colloquy.

III.     The defendant suffered no prejudice from not receiving Karr's reports before trial.

As with Marshall's taped statement, there was nothing new in Gateway investigator John Karr's reports that would have had any effect on the outcome of the trial. First, new defense counsel says that the Karr reports would have led them to interview Jalloh. As former defense counsel was aware, Jalloh pled guilty as a co-conspirator in this scheme on February 8, 2006 and was sentenced in open court prior to this trial. Former defense counsel was provided with Jalloh's plea paperwork months before the start of the defendant's trial. Second, new defense counsel argues that because of Karr's report it could have argued that the investigators "really [did not] know how many computers were alleged to have been stolen." Motion at 25. Former defense counsel was fully aware that the government and Gateway never had a complete count of all of the computers that were stolen. Former defense counsel used this information as well as it could have been used when he

prevented the government from introducing Karr's summary charts into evidence because the supporting documentation from UPS had disappeared.  The defendant suffered no prejudice from not having two of Karr's reports before trial.

IV.   Because Marshall's taped statement contains nothing material that was not provided in other discovery, the government's late disclosure of Jencks is harmless.

Marshall's taped statement was Jencks not Brady.  The statement was completely consistent with the statements and summary of statements provided to the defendant prior to trial.  For the statements to constitute Brady, they would have to be "exculpatory" or "impeaching" and they were neither.  See Brady v. Maryland, 373 U.S. 83 (1963).  The only argument that the defendant raises concerning "exculpatory" evidence in the taped statement concerns Marshall's use of the term "wholesale."  And as discussed above, Marshall was clearly referring to what Ralph told Marshall about the number of computers the defendant received and not to Gateway's corporate pricing structure.  The rest of the issues raised by the defendant go to possible impeachment.  For the most part, the defendant's issues could not even be used as impeachment because they were consistent with Marshall's trial testimony.  Even if the Court finds that some portion of the taped statement constitutes Brady, the Court should not grant a new trial because all reasonable impeachment was already accomplished.  Reversal is only appropriate where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).   Marshall, a relevant but not essential witness in the case against the defendant,  was already impeached as much as he could have been, so none of the supposedly "favorable evidence" would put the case in any "different light."

Though Jencks, the taped statement should not result in a new trial.  The Court should hold that there should be no sanction as a result of the government's error.  "The [Jencks] Act does not

reflect any constitutional requirement and there is no fixed rule regarding what must be done if the government violates the Act. Sanctions are not automatic." U.S. v. Thomas, 97 F.3d 1499, 1502 (D.C. Cir. 1996) (holding that notes and drafts are often not Jencks and the failure to preserve notes should not result in a new trial where it cannot be shown that they would have assisted the defense) citing U.S. v. Augenblick, 393 348, 354 (1969); and U.S. v. Rippy, 606 F.2d 1150, 1154 (D.C. Cir. 1979). Here, where everything new defense counsel hopes to accomplish was already accomplished, the failure to turn over Marshall's taped statement had zero impact on the jury's verdict. "When the information contained in undisclosed Jencks materials does not vary from that provided by the witness at trial, 'it would offend common sense and the fair administration of justice to order a new trial.'" U.S. v. Holton, 116 F.3d 1536, 1547 (D.C. Cir. 1997).

    The report from Karr concerning Marshall's taped statement was not Jencks. Karr was called by the government to testify about how Gateway determined that computers were being stolen and to testify about exactly how many computers were sent to addresses linked to the defendant. Upon defense motion, Karr was not permitted to testify about the computers that were sent to the defendant. Karr's testimony did not touch upon and was never intended to touch upon Marshall, who never worked for Gateway. Therefore, to the extent Karr's report touched upon other law enforcement officers' investigation and their interview of Marshall, it is not Jencks. "While we recognize that the term 'relates to' is very broad in isolation, we note that the object of the prepositional phrase is 'the subject matter as to which the witness has testified" not the 'subject matter of the proceeding' generally." Norinsberg Corp. V. U.S. Dept. of Agriculture, 47 F.3d 1224, 1229 (D.C. Cir. 1995). "'The Jencks Act . . . was intended to enable the defense to impeach a government witness by bringing any variances between Jencks material and the witness's testimony to the attention of the finder of fact." Id. quoting U.S. v. Prieto, 505 F.2d 8, 11 (5th Cir. 1974).

Because the defendant does not describe how he could have used Karr's reports to impeach Karr's trial testimony, Karr's reports were not <u>Jencks</u>.

V.     <u>New defense counsel has not provided any reason for the Court to re-visit its denial of former defense counsel's renewed motion for a mistrial.</u>

The Court has already denied former defense counsel's renewed motion for a mistrial. The defendant re-raises it because he claims that he can now identify how he was prejudiced. Former counsel acknowledged in her opening that the defendant started buying computers from Ralph in 1999. This issue has been conceded. The only question is whether or not the defendant knew that these computers were stolen. Nothing that new defense counsel now says he could have done–locate phone records, bank records, witnesses--would answer this fundamental question. Based on the defendant's own admission, the phone records would show phone calls between the defendant and Ralph. According to Ralph, the first phase was done entirely in cash so the bank records most likely would not show anything and if they did that would neither prove nor disprove that the defendant knew the computers were stolen. Finally, with respect to the witnesses, the government presented the defendant's IT person from this period who acknowledged that the defendant was receiving new Gateway computers. And the defendant presented Makini Nilliwambini, the principle of the defendant's school which received some of the computers, who described the defendant's knowledge of computers and the fact that he handled all matters concerning payments for the computers. There were no other witnesses who could have provided relevant testimony on this subject.

## CONCLUSION

The government respectfully requests that the Court deny the defendant's motion for a new trial and uphold its prior ruling concerning the start date of the conspiracy.

>Respectfully submitted,
>
>JEFFREY A. TAYLOR
>UNITED STATES ATTORNEY
>
>
>By:_____
>ROY L. AUSTIN, JR.
>Assistant United States Attorney
>Fraud and Public Corruption Section
>CA Bar #211491
>555 Fourth Street, N.W.
>Washington, D.C. 20530
>(202) 353-9458

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was sent electronically to the attorneys for the defendant, David Schertler and Daniel Onorato, Schertler & Onorato, this ____ day of March, 2007.

>_____
>Assistant United States Attorney