UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 06-0064 |
| | : | |
| | : | |
| v. | : | December 19, 2006 |
| | : | |
| | : | |
| CHARLES EMOR, | : | 9:30 a.m. |
| Defendant | : | |
| | : | |

. . . . . . . . . . . . . . . . : . . . . . . . . . . .

TRANSCRIPT OF TRIAL RECORD
VOLUME 2
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:     ROY L. AUSTIN, JR., ESQUIRE
                        UNITED STATES ATTORNEY'S OFFICE
                        555 Fourth Street, NW
                        Washington, D.C.  20530

For the Defendant:      WILLIAM R. MARTIN, ESQUIRE
                        SHAWN MONIQUE WRIGHT, ESQUIRE
                        KERRY BRAINARD VERDI, ESQUIRE
                        BLANK ROME, LLP
                        Watergate
                        600 New Hampshire Avenue, NW
                        Washington, D.C.  20037
                        (202) 772-5859

Court Reporter:         REBECCA STONESTREET, RPR, CRR
                        Official Court Reporter
                        Room 6415, U.S. Courthouse
                        Washington, D.C. 20001
                        (202) 354-3249

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

218

```
 1              THE COURT:  You don't have paper copies of them?

 2              MR. AUSTIN:  Not prepared with exhibit labels and

 3      everything else.

 4              THE COURT:  Use the system at your own risk.  We can

 5      call John up here.  He's probably going to come up and make sure

 6      your cables are plugged in better than they were.  It's your

 7      responsibility to learn how to use that stuff.  I can't help

 8      you.

 9              (Oath administered by Courtroom Deputy.)

10      (ORLANDO MARSHALL, GOVERNMENT witness, having been duly sworn,

11                     testified as follows:)

12                      DIRECT EXAMINATION

13      BY MR. AUSTIN:

14      Q.  Good morning.

15      A.  Good morning.

16      Q.  Could you please tell the ladies and gentlemen of the jury

17      your name?

18      A.  Orlando Andre Marshall.

19      Q.  And could you please spell that for the court reporter?

20      A.  O-R-L-A-N-D-O, middle name Andre, A-N-D-R-E, last name

21      Marshall, M-A-R-S-H-A-L-L.

22      Q.  And Mr. Marshall, where were you born?

23      A.  Newport News, Virginia.

24      Q.  And how old are you?

25      A.  36.
```

1    Q.   How far have you gone in school?

2    A.   I have a master's degree.

3    Q.   Master's degree in what?

4    A.   Social work.

5    Q.   Where are you presently employed?

6    A.   Child and Family Services Agency.

7    Q.   For what jurisdiction?

8    A.   The District of Columbia.

9    Q.   And how long have you had that job?

10   A.   Approximately 9 years.

11   Q.   Now, do you know a person by the name of Charles Emor?

12   A.   Yes, I do.

13   Q.   And do you see Mr. Emor in the courtroom here today?

14   A.   Yes, I do.

15   Q.   Could you please identify him by his location and an article

16   of clothing?

17   A.   Sitting over there.

18        MR. MARTIN:   Your Honor, there's no objection that this

19   is Mr. Emor.

20        THE COURT:   Yeah, I don't think we have to identify him

21   with every witness.   We know who he is.   Go ahead.

22   BY MR. AUSTIN:

23   Q.   Now, how do you know Mr. Emor?

24   A.   We were once employed together at Fedora.

25   Q.   At Fedora, you said?

1    A.    Yes, sir.

2    Q.    And what is Fedora?

3    A.    Fedora was a school/group home for children in the District.

4    Q.    And approximately when were you employed there with the

5    defendant?

6    A.    Approximately from 1996 until I believe sometime around

7    2000, 2001, maybe.

8    Q.    Did one of you supervise the other there?

9    A.    No.

10    Q.    Were the two of you close then?

11    A.    We had a pretty close relationship at one time.

12    Q.    Have you ever been to his home?

13    A.    Yes.

14    Q.    Had he ever been to your home?

15    A.    Yes.

16    Q.    And I'm sorry, where do you live now?

17    A.    I currently live in Laurel, Maryland.

18    Q.    Now, you left Fedora at some point?

19    A.    Yes, I did.

20    Q.    Approximately when?

21    A.    I believe it was sometime in 2000, maybe 2001.  I'm not sure

22    exactly what year, but sometime around that time frame.

23    Q.    And I'm sorry, were you working with Fedora while you were

24    working with D.C. Child and Family Services?

25    A.    Yes.  At some point I was working both jobs.

1    Q.   After you left Fedora, did you remain in contact with the

2    defendant?

3    A.   For a brief period.

4    Q.   Now, do you know a person by the name of Michael Ralph?

5    A.   Yes, I do.

6    Q.   And how do you know Michael Ralph?

7    A.   He is my first cousin.

8    Q.   And back in 1998, how close were you and Michael Ralph?

9    A.   We've always been close, more or less like brothers.

10   Q.   At any time did you introduce Mr. Ralph to the defendant?

11   A.   Yes, I did.

12   Q.   Approximately when was that?

13   A.   Sometime in 1998.

14   Q.   I'm sorry, what year?

15   A.   1998.

16   Q.   Why did you make that introduction?

17   A.   Mr. Emor was looking for employees for his school.  Mike was

18   unemployed at the time, and he was looking for employment, as

19   well as his wife, who was a special education teacher.  She was

20   obtaining her master's degree in special education, and, you

21   know, he had asked me did I know anybody who was looking for

22   work, and that was the reason why I introduced them.

23   Networking, so to speak.

24   Q.   How often was it you, Mr. Ralph, and the defendant together?

25   A.   I can't recall us all ever being together at one time.

222

1    Never.

2    Q.   So the introduction was made how?

3    A.   Exchanging numbers.

4    Q.   Now, do you know someone by the name of Dwayne Simmons?

5    A.   Yes, I do.

6    Q.   And how do you know Dwayne Simmons?

7    A.   Dwayne is Mike's childhood friend.  They went to high school

8    together and they were friends.

9    Q.   How close were you and Mr. Simmons back in 1998?

10   A.   We were never, never close.  I would see him -- if I went

11   over to Mike's house sometimes, he would be there.  But we were

12   never close.

13   Q.   At any time did the conversation of computers come up

14   between you and the defendant?

15   A.   Yes.

16   Q.   When is the -- and let me put it more specifically.  The

17   conversation about computer sales or the ability to get

18   computers come up?

19   A.   I don't recall specifically between me and him.  There was a

20   point where computers came up regarding him picking some

21   computers up from my house, from my address.

22   Q.   Let's talk about that.  Approximately when was that?

23   A.   That was sometime, I would speculate, between --

24        THE COURT:  Don't speculate, sir.

25        THE WITNESS:  Yes, sir.

223

1    A.   I think it was between roughly, I would say September of

2    1998.

3    BY MR. AUSTIN:

4    Q.   Was this conversation in person or over the telephone?

5    A.   It was primarily --

6         MR. MARTIN:  Excuse me, Judge.  May I ask who he's

7    referring to with the "him"?

8    BY MR. AUSTIN:

9    Q.   Was this conversation between you and the defendant on the

10   telephone or in person?

11   A.   In person.

12   Q.   And describe for the ladies and gentlemen of the jury what

13   this conversation was about?

14   A.   My conversation with him was when he came to my house to

15   retrieve the computers that were sent to my house, he gave me

16   the cash for the computers.  He inspected the boxes, I helped

17   him to load the boxes in his car, and that was it at that time.

18   Q.   So what computers were at your house?

19   A.   There were two Gateway computers.

20   Q.   And did you provide the defendant with information about the

21   computers' arrival at your house?

22        MR. MARTIN:  Objection, Your Honor.  My objection is we

23   filed a 404(b).  This is not in the indictment.

24        THE COURT:  Overruled.

25        THE WITNESS:  Could you repeat the question, please?

1    BY MR. AUSTIN:

2    Q.   Do you know how the defendant ended up at your house?

3    A.   I believe Mike told him that the computers were there.  I

4    don't recall if I called him or Mike called him, but he knew and

5    he came to pick the computers up.

6    Q.   And you said he brought payment.  Correct?

7    A.   Yes, sir.

8    Q.   I'm sorry, where were you living at that time?

9    A.   I believe it was 2503 15th Street, Northwest.

10   Q.   Washington, D.C.?

11   A.   Yes, sir.  Apartment 201.

12   Q.   How was the payment -- cash, check, money order, postal?

13   A.   It was cash.

14   Q.   Do you recall at that time how much cash?

15   A.   It was $1,400; $700 apiece for the computers.

16   Q.   Did you have any conversation with the defendant at that

17   time about this pickup and delivery?

18   A.   I can't recall anything that we said between one another.  I

19   know I helped him load the computers, he gave me the money, and

20   that was it.

21   Q.   And when you said he inspected him, how did the defendant

22   inspect these?  They came in boxes?

23   A.   Yes, sir.

24   Q.   From what company?

25   A.   Gateway.  They were white boxes with the kind of polka dots.

225

1   Q.  And you said he inspected them.  How did he inspect them?

2   A.  He opened the boxes to make sure that the computers were

3   actually in there.

4   Q.  And did you see him when he opened the boxes?

5   A.  Yes, I did.

6   Q.  And what was inside the boxes?

7   A.  Computers.

8   Q.  When is the next time you saw or spoke to the defendant

9   about computers?

10   A.  It was sometime in 1999, I would say around February of

11   1999, I believe.

12   Q.  And what happened then?

13   A.  Mike called me and he requested that if I could pick up some

14   money from Mr. Emor.

15   Q.  And when Mike called you and asked you that, what did you

16   do?

17   A.  Me and Mr. Emor arranged a pickup, a mutual spot where we

18   could both meet.  We met at the 7-Eleven around Takoma station.

19   I don't know if that's on the Maryland side or the D.C. side,

20   but I met him and he gave me an envelope.

21   Q.  It's D.C. side.

22   A.  I'm not totally sure.

23   Q.  And why there?  Why that location?

24   A.  I guess it was a mutual spot --

25           MR. MARTIN:  Objection, Your Honor.  Is he guessing?

226

1          THE COURT:  Overruled.  Well, he is guessing.

2    BY MR. AUSTIN:

3    Q.  Was there any conversation about why that location?

4    A.  No.

5          MR. MARTIN:  I'm sorry, Your Honor.  He was guessing.

6          THE COURT:  Well, I don't think the question was ever

7    answered.  The follow-up question was, was there any

8    conversation about it.  The answer was no.  I think that's the

9    end of the subject.

10   BY MR. AUSTIN:

11   Q.  What happened when you met Mr. Emor at Takoma station?

12   A.  He gave me an envelope.

13   Q.  And did you open that envelope?

14   A.  No, I didn't.  It was sealed.

15   Q.  Did you ask Mr. Emor what was in the envelope?

16   A.  I don't recall.

17   Q.  Can you describe the envelope?

18   A.  I believe it was a white envelope, it wasn't --

19         MR. MARTIN:  Your Honor, I know you don't like bench

20   conferences, but I have a motion I would like to make.  I have a

21   serious motion on this testimony, if I could have --

22         THE COURT:  I think I know what the motion is.

23   Proceed.  We'll take it up later.

24         MR. MARTIN:  May I at least put it on the record, Your

25   Honor.

1          THE COURT:  You can put on the record that you wanted

2     to make the motion now and I wouldn't let you.  Go on,

3     Mr. Austin.

4     BY MR. AUSTIN:

5     Q.  Can you describe this envelope?

6     A.  It was a white envelope.  It wasn't letter size, it was

7     bigger than a letter sized envelope, and it was quite thick, I

8     believe.

9     Q.  Could you hold your hands to show the width and length of

10    this envelope?

11    A.  I couldn't.  I can't remember back that far.

12          THE COURT:  Why do we need to know the size and length

13    of the envelope, Mr. Austin?

14          MR. AUSTIN:  Because of what was in the envelope, Your

15    Honor.

16    BY MR. AUSTIN:

17    Q.  How thick was this envelope?

18    A.  I don't remember exactly the width or the thickness, but I

19    remember it was pretty thick.

20    Q.  Did you ever open it?

21    A.  No, I didn't.

22    Q.  What did you do after you received that envelope?

23    A.  Me and Mike agreed on the same day, I believe it was a

24    Sunday, that we would meet at a middle destination between D.C.

25    and Virginia, Newport News, Virginia.  And we agreed to meet

 1    at -- we met at Kings Dominion, at the Burger King around in

 2    that area in Virginia.

 3    Q.  Now, did you have -- in 1998 and 1999, did you have any more

 4    contact with the defendant regarding computers?

 5    A.  There was a time when he called me and he told me, you know,

 6    he said, Marshall, you need to talk to your people, referring to

 7    Mike, that I needed to get them together.  They were messing up

 8    on his orders.  He made reference to the type of processors that

 9    he had received that were in the computers.  It was a Celeron

10    processor as opposed to the Pentium processor, which he told me

11    they were lesser value and that's what he had gotten from them.

12    Q.  What was his tone of voice when he was talking to you about

13    this?

14          MR. MARTIN:  Your Honor, will you allow me to make a

15    continuing objection so I can have a running objection?

16          THE COURT:  Yes, sir.

17    BY MR. AUSTIN:

18    Q.  What was his tone of voice when he was talking to you about

19    this?

20    A.  He was upset.

21    Q.  Now, Mr. Emor wasn't your only customer at that time, was

22    he?

23    A.  At that time in 1998?

24    Q.  Right.

25    A.  Yes.

229

1    Q.  What did you believe with respect to these computers?  Were

2    these computers legitimate?

3    A.  No.  I was told in the beginning that they were hot.

4    Q.  Why were you doing this?

5    A.  To help out Mike.  He had lost his job.  I believe at the

6    time he had two kids, a wife --

7         MR. MARTIN:  Objection.  Relevance, Your Honor.

8         THE COURT:  Overruled.

9    BY MR. AUSTIN:

10   Q.  You said you received a thick envelope and you received

11   $1,400.  How much of that money did you get?

12   A.  Zero.  Nothing.

13   Q.  Now, did you later get involved in this scheme?

14   A.  Yes, I did.

15   Q.  And what was your involvement in it?

16   A.  At some point Mike reintroduced this whole thing.  Pretty

17   much after the exchange of money I hadn't heard anything about

18   this whole computer thing.  Mike reintroduced it to me sometime

19   between 2000 and 2001.  He told me that they were sending out

20   computers again.  He asked me could he send some computers to my

21   apartment at that time.

22   Q.  And did you allow him to do so?

23   A.  Reluctantly, yes.

24   Q.  And did computers start coming to your house?

25   A.  Yes, they did.

1    Q.   And were these computers for the defendant?

2    A.   No, they weren't.

3    Q.   And what were you doing with these computers?

4    A.   In the beginning Mike was coming to the District and he was

5    taking the computers.  At some point he asked me did I know of

6    anybody who wanted to purchase computers.  I asked people at the

7    job, I asked a couple of people, and people started coming to me

8    asking me about the computers, did I have any computers in.

9    Some of them went to those people.

10        At one point Mr. Abdul Jalloh approached me, and he had

11   heard from a coworker about the computers.  He told me that he

12   had somebody who was willing to purchase computers in large

13   volumes.

14   Q.   So did you end up then providing computers to Mr. Jalloh?

15   A.   Yes, I did.

16   Q.   Now, who were you in touch with with respect to this scheme?

17   Were you in touch with Dwayne Simmons?

18   A.   Never.

19   Q.   Were you in touch with Michael Ralph?

20   A.   Yes, I was.

21   Q.   And you were in touch with the person on the other side,

22   Abdul Jalloh, for example.  Is that correct?

23   A.   Yes, sir.

24   Q.   What would you provide Michael Ralph with?

25   A.   Abdul would give me the money, I would turn it over to Mike.

1    I would either put the funds, proceeds in his bank account, or

2    sometimes he would come to the District and I would put the

3    money in his hand.

4    Q.  Now, these people who you were dealing with, did you tell

5    them whether or not the computers were legal or illegal?

6    A.  Yes, I did.

7    Q.  What did you tell them?

8    A.  Often the question came up, should they register the

9    computer.  Any time you set up a new computer out of the box,

10   you have to go through prompts to set it up.  And it will ask

11   you, do you want to register the computer, and people asked me

12   should they register, or you could bypass that.  And I told them

13   no.  People knew why I told them.  People knew that the

14   computers were hot.

15   Q.  They knew they were hot?

16           MR. MARTIN:  Objection, Your Honor.  Move to strike.

17   This is not Mr. Emor.  These are other people, other computers.

18   They're not Mr. Emor.

19           THE COURT:  Overruled.

20   BY MR. AUSTIN:

21   Q.  Now, did any of the computers that you ever dealt with, did

22   they ever break down?

23   A.  Yes, they did.

24   Q.  What would happen if a computer broke down?

25   A.  A lot of times I would call Mike and they pretty much

1    would -- when I say Mike would get in touch with whoever was

2    sending them out, and they would either send them a new computer

3    or whatever part was broken, they would replace the part.

4    Q.   Anything else you would do if a computer broke down?

5    A.   I remember on one occasion a computer broke down, and I took

6    it to be repaired at a local repair shop.

7    Q.   Who paid for those repairs?

8    A.   I paid for it out of my pocket, and I was reimbursed by

9    Mike.

10   Q.   Now, how much were you charging for computers?

11   A.   It varied.  I believe in the beginning, in 1998 they were

12   around $700.  It went somewhere between 500, and then the last,

13   at the very end I believe they were charging $450 for the

14   computers.

15   Q.   But none of these dealings were with the defendant.

16   Correct?

17   A.   No, they weren't.

18   Q.   And payment that you would receive, how would you receive

19   payment?

20   A.   Mostly in cash.  I know a couple of people had paid me in

21   the form of a check, maybe two or three people.  But I for the

22   most part only wanted the cash.

23   Q.   How much did you personally financially profit from this?

24   A.   I would say, a high number, maybe eight or nine hundred

25   dollars during the whole course of this thing.

1    Q.   Where was all the money going?

2    A.   Put in Mike's bank account or in his hand.

3    Q.   Why were you only getting eight or nine hundred dollars for

4    this whole thing?

5    A.   Again, I never included myself in it.  I was doing it to

6    help Mike.  It was supposed to be for a short period of time

7    until he got on his feet, and it pretty much mushroomed into

8    something else.

9    Q.   You knew this was illegal.  Correct?

10   A.   Yes, I did.

11   Q.   You had two good jobs at this point, or just one at this

12   point?

13   A.   Two, off and on.  I had gotten a part-time job, so pretty

14   much I always had two jobs.

15   Q.   You realized you were jeopardizing your job by getting

16   involved in this illegal activity, didn't you?

17   A.   I did.

18   Q.   And you still did it, didn't you?

19   A.   Yes, sir.

20   Q.   Did you get a computer for yourself?

21   A.   At one point I did get a computer, but it was at a discount.

22   I didn't get it for free, I paid for it at a discounted amount.

23   Q.   I'm sorry, you paid who for the computer?

24   A.   I paid Mike for the computer.

25   Q.   Did you receive all the shipments at your home?

234

```
1    A.   Yes, I did.

2    Q.   Did you receive all the shipments in your name?

3    A.   There was variations of my name, there was some that was

4    received in my girlfriend's name.

5    Q.   And what variations on your name?

6    A.   Sometimes it would be Andrea Marshall, which was, my middle

7    name is Andre, so the Andrea was a variation of Andre.

8    Q.   And you said your girlfriend's name?

9    A.   Yes, sir.

10   Q.   And what was that name?

11   A.   Sophia Brashear.

12   Q.   Now, are you familiar with a person by the name of Makini

13   Edwards?

14   A.   Yes.

15   Q.   How do you know Makini Edwards?

16   A.   At one point she was also an employee of Fedora.

17   Q.   Was that around the same time both you and the defendant

18   were employees of Fedora?

19   A.   Yes, sir.

20   Q.   And do you know what the defendant's relationship was with

21   Ms. Makini Edwards?

22   A.   Yes, I did.

23   Q.   And what was that relationship?

24   A.   She was the vice president -- vice principal of the school,

25   so him being the principal, essentially he was her boss.
```

235

1    Q.  Do you know whether or not they had a more intimate

2    relationship?

3    A.  Yes, I do.

4    Q.  And how do you know about that?

5    A.  Mr. Emor told me.

6    Q.  Now, do you recall July 12th, 2002?  Do you recall that

7    date?

8    A.  Yes, I do.

9    Q.  What happened on that date?

10   A.  A search warrant was executed on my home, my apartment.

11   Q.  Were you there at the time?

12   A.  Yes, I was.

13   Q.  And did you talk to any law enforcement officers at that

14   time?

15   A.  Yes, I did.

16   Q.  Did you talk to an MPD detective by the name of Vincent

17   Tucci?

18   A.  Yes, I did.

19   Q.  And when he first asked you -- they asked you about what?

20   A.  They asked me about the sales of the computers, how long

21   that the computers were coming to my house.  They asked me about

22   people who were involved, things of that nature.

23   Q.  When he very first asked you about it, what did you say to

24   him?

25          MR. MARTIN:  Objection, Your Honor.  His statements to

236

1      police are not admissible.

2              THE COURT:  Sustained.

3              MR. AUSTIN:  Your Honor, I believe he's going to try to

4      impeach him with these very same statements.  I have a right

5      to --

6              THE COURT:  Well, maybe he will.

7              MR. AUSTIN:  I have a right to put them in first.

8              THE COURT:  No, you don't.

9              MR. AUSTIN:  May we approach?

10             THE COURT:  No.  Proceed.

11     BY MR. AUSTIN:

12     Q.  At any point during that conversation, did you mention the

13     defendant's name?

14     A.  Yes, I did.

15     Q.  And where did you speak with the detective?

16     A.  I spoke with him briefly --

17             MR. MARTIN:  Relevance, Your Honor.  Where they spoke?

18             THE COURT:  Overruled.

19     A.  I spoke with him briefly in my apartment.  He asked me to --

20             MR. MARTIN:  Objection.

21             THE COURT:  Overruled.

22             MR. MARTIN:  On what he asked, Your Honor.

23             THE COURT:  Overruled.

24     A.  He asked me if I would volunteer to come to his office to

25     give him my statement.

237

```
 1    BY MR. AUSTIN:
 2    Q.  Did you have to leave at some point in the middle of the
 3    statement you were providing?
 4    A.  No, I didn't.
 5    Q.  Did you leave at some point in the middle of the statement
 6    you were providing?
 7    A.  Yes.
 8    Q.  And where did you go?
 9    A.  They released me.
10    Q.  And where did you go?
11    A.  I went home.
12    Q.  I'm sorry, before you went to the police station.
13    A.  Yes.
14    Q.  When you first talked to the detective, where were you?
15    A.  I was in my apartment.  They dropped me off at work.
16    Q.  And where were you working at that time?
17    A.  400 6th Street, Southwest.
18    Q.  And why did they drop you off at work?
19         MR. MARTIN:  Relevance, Your Honor.
20         THE COURT:  Overruled.  I'm sure he's getting to
21    something.
22    A.  I have no idea.  I don't know if they were just being nice
23    and providing me with a ride, or they wanted to see where I
24    worked.
25         MR. MARTIN:  Move to strike.  It's irrelevant, Your
```

238

 1    Honor.

 2            THE COURT:  Overruled.

 3    BY MR. AUSTIN:

 4    Q.   Did you make any phone calls when you arrived at work?

 5    A.   Yes, I did.

 6    Q.   And who did you call?

 7    A.   I called Mike.

 8    Q.   And what did you tell Mike?

 9            MR. MARTIN:  Your Honor, that is hearsay, and the

10    conspiracy has ended.

11            MR. AUSTIN:  It has not ended.

12            THE COURT:  Overruled.

13    BY MR. AUSTIN:

14    Q.   What did you tell him?

15    A.   I informed Mike, I told him that a search warrant had been

16    executed on my house, and that police were asking about me, him,

17    and everybody else.

18    Q.   Did the police show you any paperwork at your apartment?

19    A.   He showed me a spreadsheet.

20    Q.   Did that spreadsheet cover a certain period of time?

21    A.   Yes, it did.

22            MR. MARTIN:  Objection, Your Honor.  That's hearsay.

23            THE COURT:  Overruled.

24    BY MR. AUSTIN:

25    Q.   What was the period of time that that spreadsheet covered?

```
 1    A.   I can't recall from what years it covered, but it covered

 2    the period that I lived at that current --

 3              MR. MARTIN:  Your Honor, if he's not going to refresh

 4    his recollection, the document is not here.

 5              THE COURT:  He said he doesn't recall, so that's that.

 6    Move on.

 7              MR. AUSTIN:  Court's indulgence.

 8              THE COURT:  This is a good time for our midmorning

 9    break, ladies and gentlemen.  The man in the red shirt is

10    Dr. Cramer.  He's our computer doctor.  We'll take a 15-minute

11    recess.

12              (Jury out at 10:55 a.m.)

13              THE COURT:  Mr. Marshall, you may step down.  And if

14    you will, please step out of the courtroom.

15              Mr. Martin?

16              MR. MARTIN:  Your Honor, pretrial we filed a motion,

17    request for the government that we be put on notice under Rule

18    404(b) of any alleged wrongs, crimes, or other acts that

19    preceded anything other than the indictment, which goes from

20    December of '02 forward.  We were told there would be none.

21              In a pleading that was filed -- their response says the

22    government does not intend to present any 404(b) evidence.

23              We came to trial prepared to defend allegations in the

24    indictment, that the indictment began in December of 2000.  That

25    was the date the grand jury indicted, that was the date the
```

240

1       government told us they were proceeding with.  We heard almost a

2       half hour of testimony of another alleged conspiracy and crimes

3       that went 2 years prior to 1998.  That's substantially

4       prejudicial.  We would move for a mistrial.

5               THE COURT:  How about that, Mr. Austin?  Why isn't this

6       404(b)?

7               MR. AUSTIN:  It's not 404(b) because it is directly

8       related to the conspiracy.  It is part and parcel of it.  And

9       for defense counsel to get up here and say they weren't prepared

10      for this to start in 1998 totally contradicts the opening

11      statement, where I'm reading right now, where they talk about

12      the evidence will establish that in 1998 Simmons and Ralph

13      agreed to steal computers.  In 1999, Emor and Marshall bump into

14      each other.  I have a cousin who works at Gateway who can get

15      you a good discount.

16              THE COURT:  That's your opening statement?

17              MR. AUSTIN:  No, I didn't write notes on my opening

18      statement, Your Honor.  This is opening statement from defense

19      counsel.

20              THE COURT:  Uh-huh.  Okay.  Well, what about it?  When

21      did this conspiracy start?  You keep talking about phase 1 and

22      phase 2.  What is your theory?

23              MR. AUSTIN:  Your Honor, it started in 1998, is when

24      the conspiracy started.  And that is when Mr. Emor first became

25      involved in the conspiracy.

1    THE COURT:  Why aren't you bound by your indictment?

2    MR. AUSTIN:  I mean, it's an ongoing continuing

3    conspiracy that started in 1998, no significant break in it.  It

4    is all relevant to the conduct, it's relevant to intent, it's

5    relevant to everything regarding Mr. Emor's behavior throughout

6    the whole period of the -- the reason why the indictment is the

7    way it is is because that's what we actually have physical

8    records for.  There are no records really of anything

9    happening -- we have maybe a check going back and forth, but

10   Gateway's records were limited to 1 year, from May 2001 to

11   May 2002.

12   THE COURT:  So the problem here, the legal problem we

13   have here is that you are introducing evidence of a conspiracy

14   that lasted longer than you indicted it for, and I suppose the

15   question is whether the cases support that or not.  It's not

16   404(b), it's the same conspiracy.  Is that your position?

17   MR. AUSTIN:  Same conspiracy, yes.

18   THE COURT:  Well, somebody give me a case on that

19   subject.  And I understand the argument.  There's no point in

20   wasting breath arguing the point.  If either side has a case for

21   me, let me see it.

22   The next subject, you objected, Mr. Martin, when this

23   long discussion between Mr. Austin and Mr. Marshall about Abdul

24   Jalloh and his purchases.  You objected and said it was about

25   other people.  Well, it was about the conspiracy.  He can prove