1    the conspiracy.  All he has to prove is that the defendant was

2    aligned with the conspiracy, and that's some other part.  So I

3    stand by that objection.

4         I have to say, Mr. Austin, you are using a lot of time

5    with stuff that we don't need to hear about.  Why did they take

6    you to your apartment, what was the address, was it before or

7    after?  I mean, all you have to do is get to the point that he

8    called -- that he called Mike.  And we're running out of time,

9    friends.  This case has to move faster.  It simply has to move

10   faster.  You've got to get more crisp and leave out the wind-up

11   and just let's have the pitch.

12        MR. AUSTIN:  Your Honor, may I respectfully disagree?

13        THE COURT:  You can respectfully disagree, you just

14   have to move faster.

15        MR. AUSTIN:  Okay.  But I want the Court to understand

16   that the reason why -- every question I'm asking has a reason,

17   and the reason why is because there's an allegation there made

18   by defense counsel in its cross examination about why is the

19   information so limited.  And the reason why it's so limited and

20   why did people only give half the story is because they were

21   only shown something that showed a 2001, 2002 conspiracy.

22        THE COURT:  You don't have to convince me, you just

23   have to move faster.

24        MR. MARTIN:  May I just put this on the record, Your

25   Honor.  The indictment, which is very clear -- this is not on or

1    about.  Between '98 and 2000.

2            THE COURT:  I got the argument.  I need a case.

3            MR. MARTIN:  The last thing --

4            THE COURT:  Last thing what?  I'm still here.

5            MR. MARTIN:  They've changed theory, Judge.  When the

6    investigator appeared before the grand jury, and it was a time

7    frame of the period that you're investigating, it's May '01 to

8    June of '02.  We've analyzed every shred of paper.  There's

9    nothing in there that says that Mr. Emor was involved in this

10   alleged conspiracy until the witnesses took the witness stand,

11   and that's very unfair.

12           THE COURT:  Well, that's why we have witnesses.  I

13   mean, it doesn't -- never mind.  I hear you.  What I want from

14   you all is not argument but cases.

15           (Recess taken at 11:00 a.m.)

16           (Jury in at 11:16 a.m.)

17           THE COURT:  All right.  Proceed, Mr. Austin.

18   BY MR. AUSTIN:

19   Q.  Now, you've made -- you were interviewed first -- let's just

20   set the stage so everybody is back on the same page here.

21           You were at your apartment when the search warrant was

22   executed.  Correct?

23   A.  Correct.

24   Q.  This is July 12th, 2002.  Correct?

25   A.  Correct.

—244

1    Q.  You went to work and then you went to the police station to

2    give a further statement.  Correct?

3    A.  Correct.

4    Q.  When you went to work, you spoke to Michael Ralph?

5    A.  Yes, I did.

6    Q.  Did you speak to anyone else?

7    A.  Yes, I did.

8    Q.  Who else did you speak with?

9    A.  Charles Emor.

10   Q.  How did you come to speak to Charles Emor?

11   A.  At some point me and Mike had several conversations during

12   that short time period.  He called me, he asked me could he --

13   was it okay for him to give Mr. Emor my phone number.  I told

14   him it was okay.

15        In turn, Mr. Emor called me on that day.

16   Q.  That time when Mr. Emor called you, when is the last time

17   that you had spoken to the defendant?

18   A.  It had been probably a couple of years, at least 2 or

19   3 years since I had talked to him.

20   Q.  What was said during this conversation?

21   A.  It started off by me telling him about the search warrant,

22   all the various law enforcement people who came to my home.  I

23   told him that they had asked about him.  He sounded very humble

24   in the beginning and he was listening to me, what I had to say.

25   He asked me for what did I think he needed to do.  I didn't

1    offer him any advice.

2           But then the tone of the conversation changed.

3    Q.   And how did the tone of the conversation change?

4    A.   He became very angry and he said, well, listen, this is what

5    I'm going to tell them if they come for me.  And he told me that

6    he was going to say he bought all of these computers

7    legitimately, he wrote checks to my cousin for them, and...

8    Q.   Did he say anything else?

9    A.   That was pretty much it.  It was a short conversation.  You

10   know, we said good-bye and that was it.

11   Q.   Since that time, have you spoken to the defendant?

12   A.   Yes, I have.

13   Q.   And when is the next time you spoke to him?

14   A.   I saw him approximately a year later.  I was working late, I

15   was coming I think from Children's Hospital, and I stopped by

16   the 7-Eleven on Rhode Island Avenue to get something to drink

17   and a snack, and I saw him in there.

18   Q.   Did the two of you speak?

19   A.   We, we did.  We had a conversation out in the parking lot

20   for a few minutes.

21   Q.   What did you speak about?

22   A.   We laughed, you know, talked about vacations, talked about

23   the fact that I had been to Brazil.  I think I showed him some

24   of my pictures I had in the glove compartment.  He talked about

25   my truck, I talked about his truck, and that was it.  We never

 1  spoke about, you know, anything pertaining to the computers.

 2  Q.  Do you recall what kind of truck he had?

 3  A.  Yes.  It was a --

 4          MR. MARTIN:  Relevance, Your Honor.

 5          THE COURT:  Relevance?

 6          MR. AUSTIN:  Personal profit.

 7          THE COURT:  Sustained.

 8  BY MR. AUSTIN:

 9  Q.  Did you talk about the computers at all?

10  A.  No, we didn't.

11  Q.  As you sit here today, how do you feel about Mr. Emor?

12          MR. MARTIN:  Objection, Your Honor.

13          THE COURT:  Sustained.

14          MR. AUSTIN:  Bias, Your Honor, or lack thereof.

15          THE COURT:  Sustained.  Sustained.

16  BY MR. AUSTIN:

17  Q.  You've pled guilty in this case, haven't you?

18  A.  Yes, I have.

19  Q.  What did you plead guilty to?

20  A.  One count of mail fraud, conspiracy to commit mail fraud.

21  Q.  Why did you plead guilty?

22  A.  Because I'm guilty.

23  Q.  Why are you testifying?

24  A.  Because I was asked to come here and tell the truth about

25  what happened.

1  Q.  What do you hope to happen to you if you come in this

2  courtroom and tell the truth?

3  A.  That the government takes leniency on me when it comes to

4  sentencing.

5  Q.  Who actually decides your sentence?

6  A.  The judge.

7  Q.  Have any promises been made to you?

8  A.  No.

9  Q.  By anybody, by myself, by Agent Newman, by anyone on the law

10  enforcement side?

11  A.  No.

12  Q.  What happens if you don't tell the truth?

13  A.  Face repercussions for it.

14  Q.  What are those repercussions?

15  A.  Possible jail time.

16        MR. AUSTIN:  The government has no further questions of

17  this witness.

18        THE COURT:  Cross examine?

19        MR. MARTIN:  Yes, Your Honor.

20                    **CROSS EXAMINATION**

21  BY MR. MARTIN:

22  Q.  Good morning.

23  A.  Good morning.

24  Q.  Where did you receive your undergraduate degree?

25  A.  Norfolk State University.

248

1    Q.  And your master's here at Howard University?

2    A.  Yes, sir.

3    Q.  You would agree with me, would you not, that for somebody

4    with a master's degree and a lot of time invested in your

5    education, this was a pretty stupid thing to do, wasn't it?

6    A.  Yes, sir.

7    Q.  You told the jury today that you did this to try and help

8    out your cousin.  Correct?

9    A.  Right.  Correct.

10   Q.  You knew your cousin was stealing, didn't you?

11   A.  Yes, I did.

12   Q.  And you knew that you were helping him to steal, didn't you?

13   A.  Yes, I did.

14   Q.  As a matter of fact, the first computers that came, one of

15   them was for you personally, wasn't it?  You may have sold it,

16   but it was for you personally?

17   A.  No, it wasn't.

18   Q.  Four computers arrived at your home.  Correct?

19   A.  Two originally.

20   Q.  Two originally?

21   A.  Yes, sir.

22   Q.  What was the date that they arrived?

23   A.  I can't give you the precise day.

24   Q.  Let me go back and actually establish the relationship you

25   had with Mr. Emor.  You take your career, your professional

249

1  career with respect, don't you?

2  A.  Yes, I do.

3  Q.  You work with kids?

4  A.  Yes, I do.

5  Q.  And some of the kids you work with, most of the kids you

6  work with are either emotionally or in some other way

7  challenged.  Correct?

8  A.  Correct.

9  Q.  Why don't you tell the jury the types of kids that you work

10  with?

11  A.  The kids that I work with currently or in the past?

12  Q.  The kids that you were working with when you and Mr. Emor

13  were both at Fedora, and the kids that are at SunRise.

14  A.  A lot of times children who --

15          MR. AUSTIN:  Objection, Your Honor.

16          THE COURT:  Sustained.

17          MR. MARTIN:  Your Honor, he placed a child at SunRise.

18  The objection is -- that's the relationship.

19          THE COURT:  Sustained.

20          MR. MARTIN:  Okay.

21  BY MR. MARTIN:

22  Q.  Do you know Antonio Robinson?

23  A.  No, I don't.

24  Q.  Did you place a child by the name of Antonio Robinson at

25  SunRise?

```
 1    A.  I believe it was Anthony.

 2    Q.  I'm sorry?

 3    A.  Anthony.

 4    Q.  Anthony Robinson?

 5    A.  Yes.

 6    Q.  So there's no confusion as to Mr. Emor and the schools that

 7    he has, as an employee with the District of Columbia, you placed

 8    a child with him for educational purposes.  Correct?

 9    A.  I had no control over it.  I took him for the interview

10    there.

11    Q.  Did you attempt to place him there?

12    A.  It wasn't my call, it was his attorney who advised me that

13    he needed to be at SunRise Academy for his interview.  I

14    arranged a...

15    Q.  Were you the social worker?

16    A.  Yes, I was.

17    Q.  Did you object?

18    A.  No.

19    Q.  You didn't tell them that that's not a real school or that

20    they don't take care of people, did you?

21    A.  No, I --

22              MR. AUSTIN:  Objection, Your Honor.

23              THE COURT:  Sustained.

24    BY MR. MARTIN:

25    Q.  Actually, your relationship with Mr. Emor is a
```

```
 1    professional -- Your Honor, may I establish the relationship?
 2    They have a professional relationship.
 3              THE COURT:  You're doing a lot more than establishing
 4    the relationship.  The objection is sustained.
 5    BY MR. MARTIN:
 6    Q.  You had a professional relationship with Mr. Emor.  Correct?
 7    A.  Correct.
 8    Q.  When you told the jury that you've been to his house and
 9    he's been to your house, when did you go to his house?
10    A.  I went to his house, I didn't actually go in his apartment,
11    but I went to his building complex.
12    Q.  So when he asked you had you ever been to his house, you
13    said, yeah, I've been in his house.  You've never been in his
14    house, have you?
15    A.  I never went inside his apartment.
16    Q.  When you worked with Mr. Emor at Fedora Academy, you were a
17    counselor.  Correct?
18    A.  Correct.
19    Q.  And Mr. Emor was the director?  What was his role?
20    A.  Director/principal.
21    Q.  So when you said he wasn't your supervisor, as the
22    principal/director, he was in charge of the school, wasn't he?
23    A.  He was in charge of the school.  Fedora had two functions,
24    it was a school and a group home.  I didn't work for him.
25    Q.  You worked for the group home?
```

```
 1    A.  No, I worked for the group home side.

 2    Q.  At the time you were in graduate school.  Correct?

 3    A.  Correct.

 4    Q.  Now, there's no doubt that you introduced Mr. Emor to your

 5    cousin Michael Ralph, is there?

 6    A.  Correct.  Yes.

 7    Q.  Now, you told the jury in here today that that was sometime

 8    in 1998.  Correct?

 9    A.  Correct.

10    Q.  I'm going to hand you what we deem marked as Defense

11    Exhibit 4.  And I'm going to ask you to look at Defense Exhibit

12    Number 4 and look at what I have there as the statement of

13    offense, and ask you to read it, please.

14    A.  Do you want me to start from the beginning?

15    Q.  I would like you to just read it and make sure you

16    understand what it is.

17            Have you had a chance to read it?

18    A.  Yes.

19    Q.  The statement of offense was in a document that was read to

20    you in court.  Correct?

21    A.  Yes, sir.

22    Q.  You read it to a judge?

23    A.  Yes, sir.

24    Q.  Not this judge.  Correct?

25    A.  Yes, sir.
```

1    Q.   Another judge put you under oath, they asked you, is this

2    accurate, is this statement under oath accurate.  Correct?

3    A.   Yes, sir.

4    Q.   When that judge asked you to look at that statement, on

5    paragraph 2, didn't you say under oath in court that in the

6    latter part of 2000, 2000, you introduced your cousin, Mike

7    Ralph, to an acquaintance of yours named Charles Emor?

8    A.   Yes, I did.

9    Q.   Under oath you told them that it was the latter part of 2000

10   when you introduced Mr. Emor to Mike Ralph.  Correct?

11   A.   Yes, sir.

12   Q.   And at the time you did that, you raised your hand and said

13   it was accurate.  Correct?

14   A.   Yes, sir.

15   Q.   Now, since you made that statement, you've met with the

16   prosecutor, haven't you?

17   A.   Yes, sir.

18   Q.   And you've met with the investigator.  Correct?

19   A.   Yes, sir.

20   Q.   And they wanted to go back and talk about some other dates,

21   didn't they?

22   A.   Yes, sir.

23   Q.   Did you ever tell them that either you were mistaken or lied

24   in this document?

25   A.   Yes, I did.

254

1    Q.   You told them that?

2    A.   Yes, I did.

3    Q.   You told them that under oath you said something that's now

4    inaccurate?

5    A.   Yes, sir.

6    Q.   When the judge read it, the judge asked you, did he not,

7    that I want you to listen to everything I'm saying and reading.

8    Correct?

9    A.   Yes, sir.

10   Q.   And you listened to it, didn't you?

11   A.   Yes, sir.

12   Q.   And you heard the judge read in the latter part of 2000,

13   that's when you introduced them.  Correct?

14   A.   Yes, sir.

15   Q.   You never corrected it, did you?

16   A.   No, sir.

17   Q.   Now, after the government met with you and they told you

18   what their theory of the case was with this phase 1 and phase 2,

19   you started thinking.  Correct?

20   A.   Yes, sir.

21   Q.   Did you ever go back and tell the judge -- have your lawyer

22   go back and say that there's something that's not correct?

23   A.   No, sir.

24   Q.   You knew it was important that this document be accurate?

25   A.   Yes, sir.

1    Q.  Now, in 1998 and 1999, is that when you were working at

2    Fedora?

3    A.  Yes, sir.

4    Q.  I want to hand you what is marked as Defense Exhibit

5    Number 5.

6            MR. MARTIN:  And Mr. Austin, that would be the

7    December 1, 2005 memorandum of interview.

8    BY MR. MARTIN:

9    Q.  This is the Postal Inspector that interviewed you.  Correct?

10   A.  Yes, sir.

11   Q.  Do you recall meeting with the Postal Inspector and she

12   asked you to tell her -- and this would have been on

13   December 1st, 2005, just over a year ago -- that you met -- that

14   you introduced Mr. Emor to Ralph, Ralph's wife, who has a

15   special education job, because they were looking for a job in

16   2000?  I'll hand it to you and ask you if this refreshes your

17   recollection.  I'll ask you to look at the front page.

18           MR. MARTIN:  And Your Honor, I did mark that as Defense

19   Number 5.

20   BY MR. MARTIN:

21   Q.  Have you had a chance to look at it?

22   A.  Yes, sir.

23   Q.  Now, you would agree with me, would you not, that when

24   Postal Inspectors interviewed you, you told the Postal Inspector

25   that you met Mr. Emor or you introduced Mr. Emor to Mike Ralph

1    in 2000.  Correct?

2    A.  Yes, sir.

3    Q.  So that's on two separate occasions now, both in December of

4    '05 and under oath on January 26th of 2006.  Correct?

5    A.  Yes, sir.

6    Q.  So on both times when you were previously interviewed, you

7    said it was 2000?

8    A.  Yes, sir.

9    Q.  Now, when you were meeting with the Postal Inspectors, they

10    took some time to go through as many details as possible.

11    Correct?

12    A.  Yes, sir.

13    Q.  As a matter of fact, without going into any privileged

14    conversation you may have had with your lawyer, you had a lawyer

15    present, didn't you?

16    A.  Yes, sir.

17    Q.  And your lawyer, you and your lawyer talked about that you

18    had to be truthful.  Correct?

19    A.  Yes, sir.

20    Q.  You kind of went through all the facts and you were trying

21    to be accurate.  Correct?

22    A.  Yes, sir.

23    Q.  And at no point -- and I ask you to look at that last

24    document I gave you.  At no time during that December '05

25    interview did you ever say anything to the Postal Inspectors

1   about Mr. Emor meeting Mike Ralph before 2000, did you?

2   A.   No, sir.

3   Q.   During that same interview with the Postal Inspectors, you

4   told the Postal Inspectors that you never, never collected money

5   from Mr. Emor, didn't you?

6   A.   Yes, I did.

7   Q.   And you told the jury here today that you did collect money.

8   Correct?

9   A.   Yes, sir.

10  Q.   One of those is not accurate.  Correct?

11  A.   Yes, sir.

12  Q.   When you were talking to the inspectors, again they told you

13  that telling them a lie is a violation of the law, didn't they?

14  A.   Yes, they did.

15  Q.   They told you you can't lie.  They said either don't talk to

16  us, or tell us the truth, but don't lie.  Correct?

17  A.   Yes, sir.

18  Q.   And when they told you that, you went through and said,

19  okay, I never collected money.  Right?

20  A.   Yes, sir.

21  Q.   Were you lying then or are you lying today?

22  A.   I'm telling the truth today.

23  Q.   But you were lying then?

24  A.   Yes, sir.

25  Q.   Again, when you were talking to the Postal Inspectors, you

258

1    told the inspector that all the computers were shipped directly

2    between Mr. Emor and Mike Ralph, didn't you?

3    A.  Yes, sir.

4    Q.  You never told them that there was one occasion that -- you

5    never told the inspector that there were occasions when he came

6    to your apartment to pick them up, did you?

7    A.  No, sir.

8    Q.  So once again, one of those is a lie and one is not.

9    Correct?

10   A.  Yes, sir.

11   Q.  And you're telling the jury that for some reason, today is

12   the truth.  Right?

13   A.  Yes, sir.

14   Q.  Even though you were asked to tell the truth before.

15   Correct?

16   A.  Yes, sir.

17   Q.  And I'm sure the investigator said to you at the end of your

18   interview, now, Mr. Marshall, is this the truth.  She asked you

19   that, didn't she?

20   A.  I guess she did.  She probably did.

21   Q.  She told you she wanted the truth, didn't she?

22   A.  Yes.

23   Q.  She told you, don't tell me what you think, tell me what's

24   accurate and make sure it's the truth.  Correct?

25   A.  Yes, sir.

1  Q.  But you didn't.  You told her a lie, didn't you?

2  A.  Yes, I did.

3  Q.  Now, you never told the Postal Inspectors -- and I ask you

4  to take a look at that.  You never told them that you had told

5  Mr. Emor that these computers were stolen.  Look at your

6  statement.  You never told them that, did you?

7  A.  No.

8  Q.  You didn't tell them that because when you were speaking to

9  the Postal Inspectors, you knew that you had never said to

10  Charles, hey, Charles, these computers are stolen.  You couldn't

11  say that because it wasn't accurate.  Correct?

12  A.  No, that's not true.

13  Q.  You never told him that, did you?

14  A.  I didn't have to tell him.

15  Q.  I'm only asking you, did you say that these computers are

16  stolen?

17  A.  No.

18  Q.  Now, you're familiar with something called the Seed Charter

19  School, aren't you?

20  A.  Yes, sir.

21  Q.  Now, that Seed Charter School was another school here in the

22  District --

23        MR. AUSTIN:  Objection, Your Honor.  Relevance.

24        MR. MARTIN:  I can tie it in, Your Honor.

25  BY MR. MARTIN:

1    Q.  You shipped stolen computers to the Seed School, didn't you?

2    A.  Yes.

3    Q.  So SunRise Academy was not the only school that you shipped

4    computers to, was it?

5    A.  No, sir.

6    Q.  As a matter of fact, you had arrangements where you shipped

7    computers to Ramada Limit, the Ramada hotel.  Correct?

8    A.  No, sir.

9    Q.  To Howard Johnson's?

10   A.  No, sir.

11   Q.  Did you arrange for Mike Ralph to do that?

12   A.  No, sir.

13   Q.  Did you know that computers were shipped there?

14   A.  No, sir.

15   Q.  Travelodge?

16   A.  No, sir.

17   Q.  Stratford Inn?

18   A.  No, sir.

19   Q.  The Charleston Job Corps?

20   A.  No, sir.

21   Q.  You weren't involved in that part of the shipments?

22   A.  No, sir.

23   Q.  As a matter of fact, when you met with the Postal

24   Inspectors, you never told them anything about any alleged

25   scheme prior to 2000, did you?

1   A.  No, I didn't.

2   Q.  So when we start talking about this alleged phase 1 and

3   phase 2, with all the time that you spent with the Postal

4   Inspectors, you never told them there was some so-called phase

5   1, did you?

6   A.  No, I didn't.

7   Q.  Who brought it out of you, Mr. Austin?

8   A.  No, I brought it out of myself.

9   Q.  You just told him, oh, I forgot?

10  A.  No, I knew I was having to come here to testify, and I told

11  him I didn't want to come here and lie to a jury, lie to the

12  judge.  But I told him the truth.

13  Q.  It was okay to lie if it was one person.  Is that what

14  you're saying?

15  A.  No, sir.  It wasn't okay to lie.

16  Q.  When you lied to them, you didn't think that you should

17  correct it, did you?

18  A.  I did.  I was holding back.  I admit I tried to minimize

19  everybody's involvement, not only my own, but everybody.

20  Q.  You said minimize.  You lied to create that minimization.

21  Correct?

22  A.  Correct.  Correct.

23  Q.  You told the jury that you were trying to do this to help

24  Mike.  Correct?

25  A.  Yes, sir.

1    Q.  And you told the inspectors at some point you think you

2    helped Mike with about $40,000 that you deposited into his

3    direct account, correct?

4    A.  Yes, sir.

5    Q.  Now, how much of that $40,000 did you keep?

6    A.  Very little, maybe a couple hundred dollars total.

7    Q.  Actually, if you look, you told the inspectors that you kept

8    probably about $1,000.  Correct?

9    A.  That might be a high estimate.  It was a couple hundred, a

10   thousand dollars, it was an estimation, but it was very, very

11   little, what I kept for myself.

12   Q.  Do you recall saying to the Postal Inspectors that there

13   came a time when you did not want to continue receiving

14   computers, the apartment was too small, and you made only

15   approximately $1,000?

16   A.  I might have told them that loosely, but yes, I do recall.

17   Q.  When you say loosely, is it true or not?

18   A.  Yes, it's true, I told them that.

19   Q.  It's true that you said that.  Correct?

20   A.  Yes, it is.

21   Q.  But you're saying it may not be an accurate and truthful

22   statement?

23   A.  No, I'm saying the amount may not have been accurate.  But

24   it's a truthful statement.

25   Q.  When you tell the jury today that it's a few hundred

263

1    dollars, are you minimizing again?

2    A.   No, I'm not.

3    Q.   How would you be paid?

4    A.   How would I get paid?

5    Q.   Sure.

6    A.   Couple of times Mike would give me $50, he would give me

7    $100.  But I never got paid per computer.  You know, whenever I

8    would complain to him about my involvement, you know, I guess he

9    would decide it was time to shut me up and give me $50, and I

10   guess he thought that was making me happy.

11   Q.   Are you afraid of Mike?

12   A.   No, I'm not.

13   Q.   You put your career on the line and your professional

14   license on the line for a couple hundred dollars?

15   A.   Essentially.

16   Q.   You did all this for Mike?

17   A.   If you look back at our relationship, he is more of a

18   brother to me than a cousin.  We grew up in the same household

19   for 8 or 9 years.  We were raised by the same grandparents,

20   and...

21   Q.   If he's your brother, why didn't you try to stop him from

22   violating the law?

23   A.   I did.

24   Q.   Did you ever tell him, Mike, I ain't doing this no more?

25   A.   Yes, I did.

1    Q.   But you did it again, didn't you?

2    A.   I did.

3    Q.   Now, when you spoke with Mr. Emor sometime after the search

4    in '02, he told you that he was going to say, I bought these

5    computers, these computers I purchased legitimately.  He told

6    you that's what he was going to say, didn't he?

7    A.   Yes, he did.

8    Q.   He told you, don't get me in this.  I bought these computers

9    legitimately.  The first time you confronted him with the fact

10   that they raided you and those computers were stolen, he said,

11   hey, I bought these computers legitimately.  Correct?

12   A.   No, he told me that's what he was going to say.

13   Q.   Okay.  He didn't say anything else, did he?  He didn't tell

14   you, hey, guys, I knew they were stolen.  He didn't say that,

15   did he?

16   A.   No, he didn't.

17   Q.   He told you, I purchased them legitimately, didn't he?

18   A.   He told me that's what he was going to say.

19           MR. MARTIN:   May I have one moment, Your Honor?   I

20   think I'm done.  May I have a moment?

21   BY MR. MARTIN:

22   Q.   When you were interviewed by Postal Inspectors, do you

23   remember telling them that before 2000, you didn't know that

24   Mr. Emor was receiving any computers from Mike Ralph?

25   A.   Yes, I did.

1    Q.  Although I've gone over a couple of other statements you

2    made that were lies, that also is a lie.  Correct?

3    A.  Yes, it was.

4    Q.  And as a matter of fact, that's when you said that you had

5    never collected money from Mr. Emor.  Correct?

6    A.  I believe it was.

7    Q.  When you were talking about the search warrant, do you

8    remember telling the Postal Inspectors that Marshall contacted

9    you and then you contacted -- I'm sorry, that Ralph contacted

10   Emor.  You never told the Postal Inspectors that Mr. Emor had

11   called you, did you?

12   A.  I don't recall I did.  I don't recall if I did tell them

13   that.  I don't believe they asked.

14   Q.  So if they didn't ask, you didn't tell them.  Correct?

15   A.  I told Detective Tucci when he interviewed me.  He asked me

16   had anybody contacted me, and I told him yes.

17   Q.  That was in '05, though, wasn't it?

18   A.  No, that was in '02.

19   Q.  So it's your testimony that although your apartment was

20   searched, they found stolen computers in there in July of 2002,

21   you were never arrested until '05 or '06?

22   A.  '05.  '06, actually.

23   Q.  So 4 years after they found these stolen computers in your

24   home, and 4 years after you and Mike Ralph kind of got caught at

25   this, it took 4 years for them to file charges against you?

1   A.   That's inaccurate.  They never found any computers in my

2   home, and yes, it did take them 4 years.

3   Q.   They searched your house, though, didn't they?

4   A.   Yes, sir.

5   Q.   And you know, Mr. Marshall, that if you don't cooperate,

6   that you're facing somewhere in the area of a year to a year and

7   a half in jail.  Correct?

8   A.   Yes, sir.

9   Q.   And that if you do cooperate, a word from the prosecutors to

10  the judge that you have been helpful can reduce that.  Correct?

11  A.   Yes, sir.

12  Q.   So the sole reason that you're here today is not because you

13  like sitting there telling on people.  Correct?

14  A.   Yes, sir.

15  Q.   The sole reason you're here today is you want to try to find

16  a way to stay out of jail.  Correct?

17  A.   Yes, sir.

18  Q.   And can you tell this jury what motivated you to lie when

19  you were interviewed before?

20  A.   Again, I attempted to minimize what I knew about the whole

21  situation, not only to protect myself, but to protect everybody

22  who was involved.

23  Q.   And if you could find a way to guarantee that you stayed out

24  of jail --

25           MR. AUSTIN:  Objection, Your Honor.

267

1    BY MR. MARTIN:

2    Q.   You would lie again, wouldn't you?

3    A.   No, sir.

4         THE COURT:   Overruled.

5         MR. MARTIN:   No further questions, Your Honor.

6                    **REDIRECT EXAMINATION**

7    BY MR. AUSTIN:

8    Q.   On direct examination, you said you'd made about $900.

9    Isn't that correct?

10   A.   Yes, sir.

11   Q.   And on cross examination you were asked about a thousand

12   dollars.  Is that correct?

13   A.   Yes, sir.

14   Q.   Now let's talk a little bit about when you spoke to law

15   enforcement in 2002, did you mention Mr. Emor's name?

16   A.   They mentioned his name and they asked me did I know him.

17   Q.   And did you acknowledge that Mr. Emor was involved in this

18   scheme?

19   A.   Yes, I did.

20   Q.   But what you did is you said that it started in 2000.  Is

21   that correct?

22   A.   Yes, sir.

23   Q.   Not 1998/'99, when it truly started.  Is that correct?

24   A.   Yes, sir.

25   Q.   Law enforcement showed you something.  Correct?

1    A.  Yes, sir.

2    Q.  And do you remember you said something about a spreadsheet?

3    Correct?

4    A.  Yes, sir.

5         MR. MARTIN:  Objection, Your Honor.  I didn't go into

6    any of this.  I intentionally stayed away from that document.

7         MR. AUSTIN:  He can't stay away from the document.  The

8    testimony is why did he choose the dates that he did.

9         MR. MARTIN:  I don't have a recross, Your Honor.  I

10   stayed away from that document.

11        THE COURT:  I think we're repeating the same stuff.

12   I'll sustain the objection.  Let's go, counsel.

13   BY MR. AUSTIN:

14   Q.  You saw a document that started in 2001.  Is that correct?

15   A.  Yes, sir.

16   Q.  You figured that's all law enforcement knew about.  Is that

17   correct?

18        MR. MARTIN:  Objection, Your Honor.  It's leading.  He

19   can ask him what he thought.

20        THE COURT:  Sustained.

21   BY MR. AUSTIN:

22   Q.  You were asked about whether or not you had to tell the

23   defendant that the computers were stolen.  What was your

24   response?

25   A.  No.

1  Q.  Why didn't you have to tell him that the computers were

2  stolen?

3  A.  Because he knew.

4  Q.  Did you ever tell him that the computers were legitimate?

5  A.  No, I didn't.

6  Q.  When he handed you an envelope, a thick envelope, did you

7  tell him then that the computers were legitimate?

8  A.  No, I didn't.

9  Q.  When he handed you $1,400 cash, did you tell him that the

10  computers were legitimate?

11  A.  No, I didn't.

12  Q.  Did I or Agent Newman ever say to you when this conspiracy

13  started?

14  A.  No, you didn't.

15  Q.  Who brought it up first?

16  A.  I did.

17  Q.  And why did you bring it up?

18  A.  Again, I didn't want to come in here and lie to a jury.  I

19  wanted to tell the truth and be as honest as I could.

20  Q.  Do I decide what sentence you get?

21  A.  No.

22  Q.  Who decides that?

23  A.  The judge.

24  Q.  During your -- you mentioned the Seed School, Seed Charter

25  School.  Correct?

1    A.  Yes, sir.

2    Q.  You did send some computers that were addressed to the Seed

3    Charter School, or you were a part of that.  Correct?

4    A.  Actually, they were employees, they just happened to live at

5    Seed.  I never sent anything for the Seed School itself.  So

6    they were for individuals, not for the Seed School.

7    Q.  Individuals who you knew.  Correct?

8    A.  Correct.

9    Q.  During that conversation with Mr. Emor the day of the

10   raid -- and I'm sorry, were there any computers at your

11   apartment on that day?

12   A.  No, sir.

13   Q.  During that conversation, did the issue of receipts come up?

14   A.  Not to my recollection.

15   Q.  But when you talked to law enforcement, you told them that

16   this thing started in 2000.  Correct?

17   A.  Yes, I did.

18   Q.  And every time you told them --

19          MR. MARTIN:  Objection, Your Honor.

20   BY MR. AUSTIN:

21   Q.  -- that the defendant was involved.  Correct?

22          MR. MARTIN:  This is direct.  He can't lead that way.

23          THE COURT:  Sustained.

24   A.  Yes, sir, every time they asked about him --

25          MR. MARTIN:  Move to strike.

1        THE COURT:  The answer will be stricken.  Do you want

2   to re-ask the question in a nonleading way?

3   BY MR. AUSTIN:

4   Q.  Did you tell law enforcement who was involved in this

5   conspiracy post-2000?

6   A.  No, I didn't.

7   Q.  Did you tell them who was involved in 2000, 2001, 2002?

8   A.  Yes, I did.

9   Q.  And what were the names that you mentioned?

10  A.  They mentioned the names, and they were the names on the

11  spreadsheet.  And they asked me directly about the people on the

12  spreadsheets, and yes, Mr. Emor was one of them, and I did tell

13  them about his involvement.

14  Q.  And that's because you knew he was involved.  Correct?

15  A.  Yes, sir.

16        MR. AUSTIN:  No further questions, Your Honor.

17        THE COURT:  All right.  Mr. Marshall, thank you.  That

18  completes your testimony.  You may step down, sir.

19        (Oath administered by Courtroom Deputy.)

20  **(LEONARD OZOEMENA, GOVERNMENT witness, having been duly sworn,**

21                    **testified as follows:)**

22                    **DIRECT EXAMINATION**

23  BY MR. AUSTIN:

24  Q.  Good morning, sir.

25  A.  Good morning to you.