UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. Action No. 06-0064 (JR) |
| ) | |
| CHARLES EMOR, ) | Sentencing: March 20, 2007 |
| ) | |
| Defendant ) | |

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL

Mr. Emor, by and through undersigned counsel, respectfully submits this reply brief in support of his motion for a new trial. In support, Mr. Emor states as follows:

## INTRODUCTION

The record in this case is clear that there is a disconnect between what material Mr. Emor believes is exculpatory and favorable to his ability to properly defend himself at trial and what the government will acknowledge is exculpatory and favorable to Mr. Emor. Unfortunately, this is a scenario that occurs far too regularly in litigation, leading the Honorable Paul L. Friedman of this Court to conclude:

"[T]oo often in criminal cases the prosecution and defense are like two ships passing in the night when it comes to *Brady*; they fail to begin with a common understanding of the *Brady* decision and what is meant by the government's so-called '*Brady* obligation.'" *United States v. Naegele,* 2007 WL 18931 at *1 (D.D.C. 2007) (J. Friedman).

Here, the government contends that Defendant's New Trial Motion "suffers horribly by [Defendant's] new counsel's unfamiliarity with the case . . ." Government's Opposition

("Opp.") at 1.  We, on the other hand, submit that the government's analysis suffers horribly from its unfamiliarity with (1) the contents of its own file, (2) its *Brady* and *Jencks* obligations; and (3) from its unfounded claims that the salient portions contained on Orlando Marshall's videotaped statement were provided through other discovery, which is simply untrue.

> To review, under *Brady* and its progeny "[t]he government is obligated to disclose all evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case, that is, *all favorable evidence that is itself admissible or that is likely to lead to favorable evidence that would be admissible, or that could be used to impeach a prosecution witness*."

*Id*. (quoting *United States v. Safavian,* 233 F.R.D. 12, 17 (D.D.C. 2005) (emphasis added).

The government violated those obligations in this case.  For the reasons discussed in Defendant's initial motion, the government's violations of *Brady, Jencks* and Rule 16 all warrant a new trial, as does the government's two-year expansion of the pertinent timeframe, which variance first surfaced during trial.

## FACTS

***The Government's Own Closing Argument Contradicts how it Portrays Mr. Marshall's Testimony in its Brief.***

As a threshold matter, it is inconceivable that the government has argued two principal points in its brief regarding the testimony of Orlando Marshall.   First, it states "Orlando Marshall's most significant role in this conspiracy was that he introduced the defendant to Mike Ralph. . . . Marshall was a minor player in the case against the defendant."  Government's opposition at 2.  Second, government counsel attempts to argue that Orlando Marshall's statement of offense is  "indistinguishable from the taped statement." (Government's opposition at 6).

2

First, as the Court was aware, the case against Mr. Emor was circumstantial and was based on the testimony of Mike Ralph and Orlando Marshall. If either Orlando Marshall or Mike Ralph did not testify, the case against Mr. Emor would have been significantly weaker. Although it now attempts to distance itself from Orlando Marshall by downplaying the significance of his testimony, the government relied on the fact that Marshall and Ralph corroborated one another at trial. As the prosecutor stated in closing:

> Now, I wouldn't ask you to believe every single word that those guys said. I wouldn't ask you to believe necessarily half the words that those guys said. But it was corroborated and it made sense at the end of the day. They didn't just pull his name out of nowhere. He was one of their major buyers. From the beginning, once they started talking, they said he was involved.

Tr. at 568-569.

The government's statement could not have been more untrue or misleading to the jury, given that the contents of the videotaped statement would have disproved the claim that "once they [Marshall and Ralph] started talking, they said he was involved." The government had evidence contradicting the words it used in closing argument, but had not yet listened to that evidence (the tape) until post-verdict.

Next, the government attempts to argue that the generic Statement of Offense was "indistinguishable from the taped statement." Brief at p. 6. The government's position in this regard is simply wrong and belied by the facts. The only reference to Mr. Emor in the so-called "identical" statement of offense reads as follows: "In the latter part of 2000, I introduced my cousin, 'M.R.,' to an acquaintance of mine named C.E. M.R. subsequently told me that he had been selling stolen computers to C.E."

3

Mr. Marshall's videotaped statement is in no way "identical" to that proffer because there is no place on the videotaped statement where he mentions that Mr. Ralph told him that he had been selling stolen computers to Mr. Emor.  Also of import, when an investigator asked Mr. Marshall how much Mr. Emor was purchasing computers for, Mr. Marshall replied that he "had no idea what they were . . . what he was selling . . ."

Moreover, the Statement of Offense was drafted, presumably, by a prosecutor from the U.S. Attorney's Office, while the videotaped statement depicts Mr. Marshall answering questions in his own voice while depicting his facial expressions.

Mr. Emor was deprived of an opportunity to allow the jury look at Mr. Marshall's face while he spoke to Detective Tucci on videotape, moments after being questioned about his participation in this so-called conspiracy.  This is a tactic that the prosecutor apparently was able to argue to the jury successfully.  He stated, "look at the witnesses on the witness stand, compare Gabr, Ozoemana, the Dupont Computer guys to Marshall, Ralph and Simmons.   Who were more forthcoming?  Who accepted responsibility?  Who simply said what happened?"  (Tr. 568). Undoubtedly, the jury would have appreciated having the videotape to compare to Mr. Marshall's in-court presence, his ability to be forthcoming, his acceptance of responsibility and his ability to "simply [say] what happened."

Finally, in closing, the government vouched for the credibility of Mr. Marshall.  The prosecutor stated "What about Orlando Marshall?  Did Orlando Marshall overstate his relationship with the defendant?  No.  He talked about how he met him…" (Tr. 566).   Again, one of two things would have occurred had the government bothered to view the videotape or disclose it prior to trial.  First, the prosecutor most likely would not have made such a statement.  Second, counsel for Mr. Emor would have been able to emphasize the manner in which Mr.

4

Marshall *did* "inflate" the nature of his relationship with Mr. Emor between July of 2002 and December of 2006. Again, the government's own argument illustrates how Mr. Emor was directly prejudiced.

## ADDITIONAL FACTS

The government continues to claim that the audio- and video-taped statement that Orlando Marshall gave the police "was fully consistent with the other discovery provided to defense counsel before trial." Opp. at 1-2. That simply is untrue:

- there is no other source in which Marshall says, or is quoted by others as saying, that it was his understanding that Defendant was buying the computers at discount, *i.e.,* at wholesale, as he clearly says on the videotape. This flies directly in the face of his trial testimony, in which he says that Defendant knew the computers were stolen (*see, e.g.,* Tr. at 269); and it meshes perfectly with the Defendant's defense – that he was making legitimate purchases as the beneficiary of Michael Ralph's employee discount. Defendant was deprived of the use of that statement – both as exculpatory evidence, and to impeach Marshall's claim that Defendant knew the computers were stolen – because the government suppressed this *Brady* evidence until after the trial;

- there is no other source in which Marshall discusses the contents of his post-search warrant telephone conversation with the Defendant, as he does on the videotape. There is no other source to show – as the videotape shows – that in discussing that conversation, Marshall says *absolutely nothing* about the Defendant's alleged intent to lie to the police by falsely telling them that he bought the computers legitimately, even though that is how Marshall described the conversation to the jury. Thus, the tape would have provided evidence by which the defense could have impeached Marshall's testimony about the telephone conversation. Moreover, there

5

is no other source but the videotape to show that, in fact, the contents of that conversation were completely innocuous. The videotape is the only source for this evidence, which evidence is both exculpatory and impeaching. Defendant was deprived of the use of that statement because the government suppressed this *Brady* evidence until after the trial;

● there is no other source in which Marshall says, or is quoted by others as saying, that he had no involvement with Defendant except for putting him in touch with his cousin, Michael Ralph. His statement to that effect, on the videotaped statement, flies directly in the face of his trial testimony that a) Defendant was his only customer in 1998 (*see, e.g.,* Tr. at 228); and b) his detailed explanation of how he interacted with Defendant throughout the conspiracy (*see, e.g.,* Tr. at 222 - 225), including his claim that he collected cash from Defendant for the computers (Tr. at 223) and that Defendant picked up some of the computers at Marshall's home (Tr. at 222). Defendant was deprived of the use of that statement – both as exculpatory evidence, and to impeach Marshall's claim that he and the Defendant worked together on the alleged scheme – because the government suppressed this *Brady* evidence until after the trial.

● there is no other source to directly impeach the testimony of Mr. Marshall on all of the essential points he testified about in trial including, but not limited to, (1) whether he had been to Mr. Emor's house on prior occasions, (2) whether Mr. Emor had given him money in envelopes and (3) whether he was really describing his interactions with Mr. Jalloh while testifying about his so-called dealings with Mr. Emor.

There is no other source for these statements by Marshall and these forms of impeachment. The government points to none. Its conclusory statements to the contrary are untrue. Its claim that the videotaped statement is "fully consistent with other discovery provided to defense counsel before trial" (Opp. at 1-2) is utter nonsense, as is the government's argument

that its failure to turn over Marshall's taped statement cannot be a *Brady* violation "because the defendant was fully aware of each issue from the discovery provided before trial." Opp. at 3.

The government tries to downplay Marshall's importance in this trial, calling him "a minor player in the case against the defendant," Opp. at 2, and "the most insubstantial of the three cooperating co-conspirators . . ." Opp. at 3. This is curious since one of the other co-conspirators, Dwayne Simmons, admitted he had never had any contact with Defendant and that he first saw Defendant in the courtroom during trial. (Tr. at 324.)

In any event, Marshall was *the key witness*, from the Defendant's perspective, because – as trial counsel told the jury – it was Marshall who told Defendant that Defendant could buy the computers as the beneficiary of the employee discount available to Marshall's cousin, Michael Ralph. For example, in Defendant's opening statement, trial counsel stated:

> And the evidence will tell you that Mr. Marshall says, ["H]ow is the school going, what's going on with the school[?] Hey, if you need any computers, I have a cousin who works at Gateway who can get you a good discount.["] Mr. Marshall says, ["]I have a cousin who works at Gateway who can get you a good discount.["]
>
> \* \* \* \* \*
>
> Mr. Emor believed that. And nothing is obvious in this case. He believed that Mr. Marshall, who represented that he was a Gateway employee, who is related – Mr. Ralph is a Gateway employee who's related to Mr. Marshall, who Mr. Emor knows and has worked with and trusts, that this is legit, that there was no, and you will hear that evidence, there was no mention out of Mike Ralph's mouth that these computers are stolen. No mention.

Tr. At 113-114.

Similarly, in closing, the defense argued:

> Did Mr. Emor unwittingly receive these computers? Maybe. Was this a good deal that should have told him, you know,

7

> Charles, think about that. Well, who is the source? Orlando Marshall, a social worker. You saw Mr. Marshall. Mr. Marshall said he's got a master's degree, and from that he knew Charles Emor.
>
> These guys aren't hanging out in the street smoking dope, they're not out here playing at the clubs, they're working at a social agency for kids. He thinks he can trust Orlando. And Orlando Marshall tells him, ["]hey, I can introduce you to somebody who can help you get a discount.["] The only person who did not know that that person was a thief was Charles Emor.

Tr. at 579.

Thus, despite the government's attempt to downplay Marshall's importance at trial, he was key to the defense. If the government had not suppressed Marshall's videotaped statement, Defendant could have used it not only to build up the defense he announced to the jury, but to completely undercut Marshall on the critical issues for which the government proffered him.

## LEGAL ANALYSIS

**I.     The Statements Made by Orlando Marshall During his Videotaped Interview are *Brady* Evidence, are Material and are Found in None of the Discovery Provided to the Defense.**

**A.     The "Wholesale Rate" Statement.**

The government contends that its suppression of Orlando Marshall's videotaped statement until after trial cannot constitute a *Brady* violation because, it alleges, "the defendant was fully aware of each issue from discovery provided before trial." Opp. at 3. As noted above, that is simply untrue and the government's brief does not support its contention on this point.

For example, concerning Marshall's statement on the tape that he understood that Defendant was buying the computers at a "wholesale rate," the government points to no pre-trial

8

discovery in which Marshall said any such thing. Rather, they argue that "[a]ll Marshall was saying . . ." Opp. at 3.

First, that is an inappropriate response. No one knows whether that was "all Marshall was saying," because the government suppressed his videotaped statement and Marshall's testimony was not tested through cross-examination to see what he meant.

Second, contrary to the government's argument, it points to no source of discovery that contained such a statement by Marshall. That's because there is none. Rather, they point to *trial testimony* by *another witness*, Michael Ralph, and to a Memorandum of Interview concerning – not Marshall – but, again, Michael Ralph.

As noted above, Defendant's defense was based on what Marshall – not Ralph – told him. This is what his trial counsel told the jury during opening statement and closing argument. The problem with trial counsel's argument is that – because the government suppressed Marshall's videotaped statement – there was no testimony or other evidence to point to in support of it. Had the government turned over the tape on a timely basis, the defense could have used it to build an evidentiary foundation for its argument. Marshall would have had to admit, had the defense been able to confront him with the tape, that he told the police at the outset that it was his understanding that Defendant was simply buying the computers at wholesale. The defense would then have had evidence to which they could point to support their central argument – that Marshall told the Defendant that this was a legitimate deal.

And, of course, the defense could have used that statement in Marshall's videotape to impeach his trial testimony that the Defendant knew the computers were stolen.

Thus, that statement is *Brady,* both in the sense that it is exculpatory and it is impeaching. It is material to Defendant's defense. It is found in none of the discovery that

9

was provided to the defense. The government's suppression of this *Brady* evidence warrants a new trial.

### B.    The Post-Search Warrant Telephone Conversation.

Again, although it starts its argument by claiming that "defendant was fully aware of each issue from the discovery provided before trial," Opp. at 2, the government points to none in its brief. Again, that's because there is none. Rather, instead of pointing to pre-trial discovery, the government again seeks to rely on trial testimony, this time by government witnesses Ahmed Gabr and, again, Michael Ralph. Opp. at 4 - 6.

Thus, as we stated in our initial brief and reiterate here, there was no other source for the contents of the Marshall/Emor telephone conversation, let alone a source as "fresh" as the statement Marshall gave the police within hours, if not minutes, of talking with Defendant. Marshall's videotaped statement is the only source, but the government suppressed it.

Notably, the government never disputes the *impeaching* nature of what Marshall says about that post-search warrant telephone conversation. Rather, it claims that Marshall's description on the videotape of what Defendant said is inculpatory, and that it is unclear to the government how that statement could be exculpatory. Opp. at 4, 5.

Of course, the impeaching nature alone is enough to make it *Brady* evidence that should have been turned over, pre-trial. *Strickler v. Greene,* 527 U.S. 263, 281-282 (1999). As the government concedes, there can be no question that Marshall's recounting of that telephone conversation on the videotape completely undercuts his trial testimony, in which he claimed that Defendant essentially confessed his guilty knowledge and said he was going to lie to the police by telling them that he'd purchased the computers legitimately.

But Marshall's account of what Defendant said, as reflected on the videotape, is *also* exculpatory. There, Marshall says he told Defendant that the police had executed a search warrant on Marshall's home, looking for Gateway computers, and that Defendant responded that "he didn't have any merchandise, you know, and that if they wanted to come and search they could come." Ex. D (to Defendant's original motion) at 8-9. Since, as the government points out, there "was never any disagreement at trial that the defendant used some of the Gateway computers for the school," Opp. at 4, Defendant could *not* have meant, when he referred to "merchandise," that he had no Gateway computers. He must have meant that he had no *stolen* merchandise, which was consistent with his defense. This could have all been explored with Marshall, and would have buttressed Defendant's defense that he thought this was a legitimate deal in which he paid by check, had the government not suppressed the videotape.

On this issue, too, then, the videotape contains evidence that is both *Brady* and is material. The government's suppression of that evidence warrants a new trial.

The government, instead of pointing to any pre-trial discovery that contained Marshall's account of this telephone conversation, points to the trial testimony of Michael Ralph, claiming that it was consistent with Marshall's *trial* testimony (but not his videotaped statement) concerning the post-warrant telephone conversation with Defendant. That, however, only *strengthens* the argument that Defendant needed Marshall's videotape at trial. If he had had it, he could have shown: 1) that Marshall had changed his story about the contents of what Defendant said in that telephone conversation; 2) that he changed it so as to be consistent with what his cousin and co-conspirator, Michael Ralph, had just told the jury; and 3) that they were both making this up in order to enhance their chances at a § 5(k)(1) letter

by "serving up another head on a platter," as Defendant's trial counsel put it. The tape would have given trial counsel powerful evidence to show that Marshall and Ralph were continuing to conspire with one another but, this time, their goal was to "deliver Defendant's head" in order to help themselves, and that their "manner and means" were the coordination of their stories on what Defendant allegedly told them. If the Defendant had had the videotape, he could have shown the jury undeniable proof that Marshall changed his story concerning what Defendant allegedly told him in that conversation.

But, of course, he did not have the tape. The government held onto it until after trial.

### C. The Scope of Marshall's Involvement With Defendant.

On the issue of the scope of Marshall's interactions with Defendant, the government again contends that the "subject of the defendant's third 'critical issue' was provided to the defendant in discovery prior to trial." Opp. at 6. At least on this issue, the government actually points to something that was turned over during discovery, namely, Marshall's "Statement of Offense." *Id.*

What Marshall said therein, however, differs, in a material respect, from what he said on the suppressed videotape. In the videotaped statement, Marshall says that he put Defendant in touch with Marshall's cousin, Michael Ralph, but then goes on to say, "And they made those purchases solely on their own. *I had no involvement*." Ex. D (to original Motion) at 5 (emphasis added). Thus, in the videotaped statement, Marshall goes much further than he did in the Statement of Offense by claiming that, after introducing Ralph and the Defendant, he had no further involvement. That affirmative statement is what gives the videotape its impeaching power: it could be used to attack his trial testimony in which he describes his ongoing involvement in the scheme, some of which included his alleged dealings with Defendant.

12

Thus, contrary to what the government says, Marshall's "Statement of Offense" is *not* "indistinguishable from the taped statement." Opp. at 6. The taped statement contained additional and material *Brady* evidence, the use of which the Defendant was deprived by the government's suppression of the tape until after trial.

> **D.    Summary:  The Videotape Provides Unique *Brady* Evidence on Material Issues.**

The critical contents of Marshall's videotaped statements were not, as the government repeatedly contends, produced elsewhere before trial. Defendant was robbed of this *Brady* evidence, both for its exculpatory and impeaching value, because the government suppressed it until after trial. Defendant was prejudiced thereby. He did not receive a fair trial, and there can be no confidence in the jury's verdict. Thus, under *Kyles v. Whitley,* 415 U.S. 419 (1995), *Banks v. Dretke*, 540 U.S. 668, 698 (2004) and other *Brady* jurisprudence, Defendant is entitled to a new trial.

> **II.    Defendant's Impeachment of Marshall Would Have Been More Devastating had the Government not Suppressed his Videotaped Statement.**

The government contends that, if it had complied with its *Brady, Jencks* and Rule 16 obligations by timely producing the suppressed videotape, the Defendant's impeachment of Marshall on other points would have been no stronger than it already was. Perhaps this is so with regard to the issue of how much Marshall was paid for his involvement in this scheme. It is certainly *not* so, however, on the issues of the number of computers that Marshall received or, even more importantly, who ultimately received those computers. On those issues, as with those discussed in Section I, above, the videotape is the only source in which Marshall says that he was

13

not sure how many computers he received; and that, however many he received, the vast majority of them went to his friend, Mr. Jalloh, and not to Defendant.

On the issue of how many computers Marshall received, Marshall says on the tape that he did not think it was as many as 122. In light of that, it is remarkable that the government claims that "[a]t no time does Marshall deny that he received this number." Opp. at 8. Moreover, according to the second report of John Karr, which was also not turned over until *after* trial – despite the fact that Karr testified at trial as a government witness – the number of computers shipped to Marshall over a six-month period in 2001-2002 was 166. This could all have been used to show that Marshall was lying about the extent of his involvement in this scheme and, by extension, that he was lying about Defendant's involvement in it, as well.

The information contained on the tape about Mr. Jalloh is even more critical. On the tape, Marshall describes in detail his extensive dealings with Mr. Jalloh. Taken in tandem with Marshall's statement – found only on the tape – that he simply introduced Defendant to Marshall and then had no further involvement with Defendant, defense counsel could have built an evidentiary foundation from which to argue that it was Jalloh, and not Defendant, to whom Marshall was really referring, and with whom Marshall was dealing in what he described as "Phase I," as we discuss at more length in our initial brief. The government is wrong when it states that "Marshall's trial testimony concerning the defendant, Jalloh and phase two was completely consistent with the taped statement." Opp. at 8-9. At trial, as shown by the government's excerpt of Marshall's testimony (Opp. at 9), all Marshall said was that he ended up providing computers to Jalloh. That is very different from his admission in his videotaped statement that "[p]rimarily, the computers that were sent to my home were for Mr. Jalloh, for

him to pick up." Ex. D at 18.  Unlike his trial testimony, Marshall's videotaped statement makes clear that his main customer was Jalloh, not Defendant.

Thus, contrary to the government's contentions, Defendant's impeachment of Marshall *would* have been more devastating had the government complied with its obligations under *Brady, Jencks* and Rule 16.  In a case like this, where even the government admitted during trial the weakness of its case, and where Marshall's testimony was key to the defense, it cannot be said, as the government argues, that further impeachment of Marshall would have made no difference.  Such impeachment clearly could have been the tipping point that would have resulted in an acquittal.

### IV.　**The Government's *Jencks* Violations Were not Harmless.**

In arguing that its *Jencks* violations were harmless, the government again relies on the premise that Marshall's videotaped "statement was completely consistent with the statements and summary of statements provided to the defendant prior to trial." Opp. at 11.  We have shown that premise to be false.  Since the government's argument is based on a false premise, its argument falls.

Here, of course, the Defendant was unaware of the *Jencks* violation until after trial, when the government finally came clean and provided Marshall's taped statement and Karr's reports.  There was nothing further Defendant could have done to bring these violations to light during trial.

Assuming, for a moment, however, that these *Jencks* violations had surfaced during trial, a number of sanctions would have been available.  These would have ranged from simply giving Defendant sufficient time to review them so he could use them effectively, to striking a witness's testimony, to declaring a mistrial.

At this stage, however, and in light of the highly prejudicial nature of the government's breach, Defendant should be granted a new trial on the basis of the *Jencks* violation, as well as because of the *Brady* violations.

### V. The Variance Between the Timeframe Covered by the Indictment and That Presented by the Government at Trial Constitutes yet Another Ground for a New Trial.

The government misses the point with regard to this timeframe issue. The point is that if the government had not sandbagged Defendant on this issue, Defendant could have prepared to meet the expanded timeframe in the ways outlined in his initial motion. By doing so, he could have further undermined an admittedly weak government case. Since he was caught unawares with regard to the years 1998 – 1999,[1] he could not fully defend against this new timeframe that was sprung on him for the first time at trial.

The government goes on to argue that "[n]othing that new defense counsel now says he could have done – locate phone records, bank records, witnesses – would answer [the] fundamental question [of whether Defendant knew the computers were stolen]." Opp. at 13. Those steps could have, however, led to further evidence that Marshall, Ralph and others were lying, in general, and lying in particular about Defendant's knowledge that the computers were stolen. That could have tipped the scales in this case.

The arguments made on this issue by Defendant's prior counsel were all made *before* the government's *Brady, Jencks* and Rule 16 violations came to light. Now that they have surfaced,

---

[1] The government states that "[f]ormer counsel acknowledged in her opening that the defendant started buying computers from Ralph in 1999. The issue has been conceded" Opp. at 13. What she actually said in her opening was: "Sometime around 1999, Mr. Emor bumps into Mr. Marshall." Tr. at 112. She does not say that it was *in* 1999 but, even if she had, she does not say whether it was early, mid- or late 1999. She then says that "a couple of weeks later," Michael Ralph calls Defendant. *Id.* at 113. If trial counsel was talking about late 1999 that Defendant and Mr. Marshall bumped into one another, then "a couple of weeks later" could still be a reference to the year 2000, consistent with the Indictment. In any event, trial counsel does *not* state that Defendant began buying computers from Ralph in 1999, as the government claims.

16

we also know that some of the suppressed *Brady* evidence went directly to this timeframe issue. This is because, in his videotaped statement, Marshall says that his involvement with this scheme lasted only from October, 2001 through roughly May, 2002. Ex. D at 18.

Thus, even though the Court denied Defendant's earlier efforts on this issue, we now know that this variance issue does not stand alone. Rather, it is one of a number of bases for granting Defendant a new trial (the others being the *Brady, Jencks* and Rule 16 violations discussed herein, and in Defendant's initial motion). Taken together, it is clear that justice requires a new trial in this case, a trial in which Defendant can prepare for the years 1998 and 1999, and where he can utilize the powerful *Brady* evidence of which he was deprived at his first trial.

## **CONCLUSION**

Given the brevity of this trial; given the five years that the government had to investigate this case and to comply with its obligations under *Brady, Jencks* and Rule 16; given the fact that the record is replete with the government's failure to timely comply with those obligations both before and during trial; and coupled with the prosecution's effort to create a variance from the Indictment without first properly responding to the Defendant's request for a Bill of Particulars

and his 404(b) request; we respectfully submit that it would constitute a great injustice to deny Mr. Emor's request for a new trial. Therefore, Defendant respectfully requests that the Court grant him a new trial.

Respectfully submitted,

SCHERTLER & ONORATO, LLP

_____/s/_____
David Schertler (D.C. Bar No. 367203)
Danny Onorato (D.C. Bar No. 480043)
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, DC 20004
Tel. (202) 628-4199
Fax: (202) 628-4177

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically this 12th day of March, 2007 upon Assistant United States Attorney Roy L. Austin, Jr., Esq., counsel for the government.

_____/s/_____
Danny Onorato